**CHLOE Z FISHING CO., INC.,
et al., Plaintiffs,**

v.

**ODYSSEY RE (LONDON) LIMITED,
formerly known as Sphere Drake Insurance, P.L.C., et al., Defendants.**

**No. 99–2521–IEG RBB.**

United States District Court,
S.D. California.

April 26, 2000.

Edward C. Walton, Walton and Associates, San Diego, CA, for Plaintiffs.

Elizabeth Ann Kendrick, Keesal Young and Logan, Long Beach, CA, Robert J. Bocko, Keesal Young and Logan, Seattle, WA, for Defendant.

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PLAINTIFFS' ACTION**
[Doc. No. 3]

GONZALEZ, District Judge.

Presently before the Court is defendants' motion to compel arbitration and stay the above-referenced proceedings. For the reasons discussed below, the Court hereby grants the defendants' motion to compel arbitration and orders that the action be stayed pending arbitration.

## BACKGROUND

On September 24, 1999, Chloe Z Fishing Co., Inc., and eighteen other named plaintiffs (the "plaintiffs") filed an action in the Superior Court of the State of California for the County of San Diego, against two London based insurers—Odyssey Re (London) Ltd. and Sphere Drake Underwriting Management—and several Doe defendants (the "defendants"). On November 29, 1999, defendants removed the action to this Court pursuant to 28 U.S.C. § 1441(b) and 9 U.S.C. § 205 based on original federal question jurisdiction under 28 U.S.C. § 1331, as well as diversity jurisdiction under 28 U.S.C. § 1332. (*See* Defs.' Not. of Removal (11/29/99) at 2.)

*1. The Parties*

Plaintiffs are various corporate entities and individuals associated with the tuna-fishing operation established by the Zuanich family over the course of the twentieth century, (*see* Compl. at ¶ 31), who can be categorized into four groups. First, the twelve "Z Boat Companies" are corporations existing under the laws of various states and territories of the United States with their principal places of business in San Pedro, California, each of which owns a commercial tuna-fishing vessel as its principal asset. (*See id.* at ¶¶ 1–12.) The commercial fleet of twelve tuna-fishing vessels is itself known as the "Zee Fleet." (*See id.* at ¶ 14.) Second, the two "Z Management Companies," which exist under the laws of the states or territories of the United States and have their principal place of business in San Pedro, California, provide management services for the Zee Fleet. (*See id.* at ¶¶ 16–18.) Third, plaintiff Big Eye Helicopters, Inc. ("Big Eye"), is a corporation existing under the laws of Guam with its principal place of business in San Pedro, California, which has provided helicopters for hire and various support services for use in the fishing operations of the Zee Fleet. (*See id.* at ¶ 15.) Finally, the four "Z Owners" are individual members of the Zuanich family who are shareholders, officers, and/or directors in some or all of the Z Boat Companies, the Z Management Companies, and Big Eye. (*See id.* at ¶¶ 19–23.)

Defendants Odyssey Re (London) Ltd., formerly known as Sphere Drake Insurance, P.L.C. ("SDI"), and Sphere Drake Underwriting Management Ltd. ("SDUM"), are corporate and business entities organized and existing under the laws of England and Wales. (*See id.* at ¶¶ 24–25.) Defendants SDI and SDUM provide, respectively, insurance and underwriting services to various commercial enterprises, including marine insurance services to plaintiffs. (*See id.,* at ¶¶ 35–38.)

*2. The Insurance Relationship Between Plaintiffs And Defendants*

Plaintiffs purchased marine insurance coverage contracts from defendants in the form of "Protection and Indemnity Policies" (the "P & I policies") for the relevant six year period from February 20, 1991 to May 20, 1996. (*See id.* at ¶ 38). First, P & I policy SAAWK00005 (the " '005 P & I policy") was in effect between the parties from February 20, 1991 through and including May 20, 1992. (*See id.; see also* Defs.' Attach. Entitled "1991 (SD 350)" and "1992 (SD 350)" to Decl. of Mark Jones ("Jones Decl.") (12/17/99).) Upon termination of the '005 P & I Policy, plaintiffs purchased P & I policy SAAWK00437 (the " '437 P & I Policy") effective from May 20, 1992 to May 20, 1993, and re-

newed annually through May 20, 1996. (*See* Compl. at ¶ 38; *see also* Defs.' Attach. Entitled "1993(SD350)," "1994(SD 350)," and "1995(SD 352)" to Jones Decl.) Both sets of policies issued by defendants broadly provide insurance protection to plaintiffs in the event of personal injury claims by fishermen and crew members injured on board any of the vessels in the Zee Fleet. (*See id.* at ¶¶ 39–40 (citation omitted).)

### 3. Actions Giving Rise To This Litigation

Due to various fluctuations in the international tuna market and the resulting financial instability, plaintiffs liquidated most of the vessels in the Zee Fleet (*see id.* at ¶¶ 33 & 42), and ceased the majority of their operations in 1996 (*see id.* at ¶ 34). However, pending against the plaintiffs are claims by various fishermen employed by the Zee Fleet (the "Fishermen Claimants") for personal injuries arising from their work on vessels in the Zee Fleet during the 1991 to 1996 period covered by the P & I policies. (*See id.* at ¶ 44.) Since each of the claims by the Fisherman Claimants pursuant to the general maritime law of the United States seek recovery in amounts exceeding the deductible specified in the applicable P & I insurance polices (*see id.*), plaintiffs reported the legal actions by the Fisherman to defendants (*see id.* at ¶ 46). Defendants then took over the control and direction of the defense being provided to the various Z Boat Companies and the Zee Fleet vessels named in the claims filed by the Fishermen Claimants. (*See id.* at ¶¶ 47–48.) Alleging that the manner in which defendants directed the handling of the claims lodged by the Fishermen Claimants "changed significantly" to plaintiffs' detriment once plaintiffs began experiencing financial difficulties (*see id.* at ¶ 50), plaintiffs filed this action for breach of the implied covenant of good faith and fair dealing, unfair business practices, intentional interference with contractual relations, and declaratory relief (*see id.* at

¶¶ 29a–c, 56–60, 62–66, 68–79, 81–88, and 90–92).

### 4. The Present Motions

After removing the plaintiffs' action from state court pursuant to 28 U.S.C. § 1441(b) and 9 U.S.C. § 205, the defendants filed the instant motion to compel arbitration and to stay the action pending arbitration on December 6, 1999. (*See generally* Defs.' Mot. to Compel (12/6/99).) Relying on the arbitration clauses in the P. & I policies of insurance referenced in the plaintiffs' complaint, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and the Federal Arbitration Act in support of their motion, defendants argue that the Court must compel plaintiffs to submit their claims to arbitration in London. (*See* Defs.' Mem. P. & A. in Supp. of Motion to Compel ("Defs.' Mot. to Compel") (12/6/99) at 4–5, 7–8, 10–12.) Plaintiffs filed their opposition on December 27, 1999, challenging the scope of the arbitration clauses based on both the Convention on the Regulation and Enforcement of Foreign Arbitral awards and principles of contract formation under California law. (*See* Pls.' Opp'n to Defs.' Mot. to Compel ("Pls.' Opp'n") (1/27/99) at 3.) In their reply, filed on January 12, 2000, defendants dismiss plaintiffs' "frontal assault" on the formation of the insurance contracts as erroneous and argue that the arbitration clauses encompass the present litigation because all the causes of action alleged by plaintiffs involve construing the parties' contractual rights and duties. (*See* Defs.' Reply (1/12/00) at 1–2, 4–6, & 11.)

On February 17, 2000, the Court requested the parties to submit supplemental briefing on certain factual and legal issues raised in the determination of the scope and enforceability of the arbitration clauses at issue. (*See Order Scheduling Oral Arguments and Requesting Supp. Briefing* (2/17/00) at 1–6.) Based on the entire record, including the declarations

and supplemental memoranda submitted by the parties, as well as oral argument presented at the hearing on April 4, 2000, the Court turns to the merits of defendants' motion.

## DISCUSSION

### A. APPLICABLE LAW

#### I. MOTION TO COMPEL ARBITRATION

An arbitration provision in an international commercial agreement, such as the P & I marine insurance policies at issue in the present case, is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), foll. 9 U.S.C. § 201.[1] The Convention must be enforced according to its terms pursuant to the enabling legislation adopted by Congress—Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201–208, and any provisions of Chapter 1 of the FAA, 9 U.S.C. §§ 1 *et seq.*, which do not conflict with the Convention, *see* 9 U.S.C. § 208. *See generally Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co.*, 767 F.2d 1140 (5th Cir.1985) (recognizing enforceability of the terms of the Convention due to its negotiations pursuant to the Constitution's treaty power and Congress's adoption of "enabling" legislation which makes the Convention "the highest law of the land.")

■ Once a party in a suit subject to the Convention moves to compel arbitration pursuant to 9 U.S.C. § 206, the substantive provisions of Chapter 2 of the FAA direct a court to perform a two-step analysis before referring the dispute to arbitration. *See Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186–87 (1st Cir.1982); *accord Prograph Intern. Inc. v. Barhydt*, 928 F.Supp. 983 (N.D.Cal.1996); *Hoogovens Ijmuiden Verkoopkantoor, B.V. v. M.V. Sea Cattleya*, 852 F.Supp. 6 (S.D.N.Y.1994). At the first stage of the analysis, the Court makes a limited inquiry based on four preliminary questions to determine the existence of an arbitration agreement which falls under the Convention. *See Ledee*, 684 F.2d at 186–87 (citations altered); *Sedco*, 767 F.2d at 1144–45. Next, if the district court resolves the four preliminary questions in the affirmative, it *must* order arbitration, *see Ministry of Defense of Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992) (holding that the use of the word "shall" in 9 U.S.C. § 201 gives the court little discretion not to enforce award falling under the Convention), unless "it finds the agreement 'null and void, inoperative or incapable of being performed'" under Article II, § 3 of the Convention, *see Ledee*, 684 F.2d at 187 (citation omitted).

■ At each stage of the inquiry, the Court must be mindful of both the federal policy favoring arbitration and the underlying principles of the Convention and its adoption. *See e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the *federal* policy favoring arbitration.") (emphasis added); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (noting that strong policy favoring arbitration "applies with special force in the field of international commerce."); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (noting that the goal of the Convention as well as the purpose of its implementation by Congress is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate" are enforced); *Island Territory of Curacao v. Solitron*

1. The Convention was ratified by the United States on September 30, 1970. *See* 21 U.S.T. 2517, T.I.A.S. No. 6997 (1970) (text reprinted following Ch. 2 of the Federal Arbitration Act, 9 U.S.C. § 201). Unless otherwise noted, all citations to the Convention refer to the text following section 201.

*Devices, Inc.,* 356 F.Supp. 1 (S.D.N.Y.) (noting that Congress's purpose in implementing the Convention through Chapter 2 of the FAA is to encourage the arbitration of disputes arising from transactions by American businesses in foreign countries), *aff'd,* 489 F.2d 1313, *cert. denied* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974).

## II. MOTION TO STAY ACTION PENDING ARBITRATION

Although the remedy of a stay pending arbitration is available under Chapter 1 of the FAA, 9 U.S.C. § 3, the question of whether this remedy is available in a case falling under the Convention is more problematic since Chapter 2 of the Act—the Convention and its implementing legislation—does not expressly grant the Court authority to stay an action pending arbitration. *See Filanto, S.p.A., v. Chilewich Int'l Corp.,* 789 F.Supp. 1229, 1240 (S.D.N.Y.1992). However, 9 U.S.C. § 208, the final section of the statute implementing the Convention, states that Chapter 1 of the Act applies to Chapter 2 cases when not in conflict with Chapter 2. Therefore, Chapter 1 of the Arbitration Act, 9 U.S.C. § 3, which governs arbitration agreements relating primarily to interstate commerce, and which makes a stay available, *may* be construed to allow a stay in cases falling under the Convention insofar as it is not inconsistent with the Convention or Chapter 2, and based on the facts of the case. *See Tennessee Imports, Inc. v. Filippi,* 745 F.Supp. 1314, 1323–25 (M.D.Tenn.1990) (reviewing cases regarding the allowance of stay pending arbitration or the requirement that a case be dismissed for lack of subject matter jurisdiction once an order to compel arbitration issues, and holding that both are permissible methods of referral under the Convention); Restatement (Third) of the Foreign Relations Law of the United States § 487(2) (1980) (same).

## B. ANALYSIS

As a preliminary matter, before addressing the merits of the defendants' motion, the Court considers two requests for judicial notice pursuant to Federal Rule of Evidence 201. First, as requested by both parties, the Court takes judicial notice of plaintiff's complaint, filed in the Superior Court of the State of California, County of San Diego on September 24, 1999, (*see* Ex. A to Defs.' Not. of Removal). *See* Fed. R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

■ However, as to defendants' second request, the Court does not take judicial notice of the individual plaintiffs' declarations which assert that the Court lacks personal jurisdiction over them and request the Court to quash service of summons in a previous and separate action against them in this Court. (*See* Defs.' Mot. to Compel at 4, n. 2 (requesting that the Court take judicial notice of documents filed by plaintiffs in case 97–CV–1975–B (POR)); *see generally* Decl. of Robert J. Bocko (12/6/99).) As plaintiffs note, the declarations as to personal jurisdiction relate to "alter ego" lawsuits against plaintiffs who did not own the vessels on which they were injured, post-date the relevant time period at issue in the present dispute, and are limited to two individual plaintiffs and the Chloe Z Fishing Company only. (*See* Pls.' Opp'n at 6, n. 3.) These declarations are irrelevant for the purposes of this action insofar as the complaint is filed by various other individual plaintiffs and corporate entities, relates to a time period between 1991 to 1995, when plaintiffs were still operating their businesses, and alleges many different factors as the basis for this Court's personal jurisdiction over the parties.

Moreover, even if this action stems from events during the same time period, the issue of personal jurisdiction is simply not implicated in the Court's resolution of defendants' present motion. *See Kahn Lu-*

cas *Lancaster, Inc. v. Lark Int'l. Ltd.*, 186 F.3d 210 (2d Cir.1999) (noting that issues of arbitrability may be decided independent of considerations of personal jurisdiction). Therefore, these declarations by plaintiffs do not constitute "adjudicative facts" or facts concerning the immediate parties or issues raised in this particular case. *See* Fed.R.Evid. 201(a); Advisory Comm. Note to Subdivision (a) (1972); Kenneth Davis, 2 *Administrative Law Treatise* 353 (1958) ("When a court or any agency finds facts *concerning the immediate parties*—who did what, where, when, how, and with what motive or intent—the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts.") (emphasis added).

Accordingly, the Court **GRANTS** the parties' request to take judicial notice of the plaintiffs' complaint and **DENIES** defendants' request for judicial notice of certain declarations by plaintiffs in a previous action in this jurisdiction.

## I. DEFENDANTS' MOTION TO COMPEL ARBITRATION

For the purposes of the defendants' motion to compel arbitration, the parties dispute the existence of an agreement to arbitrate, the scope of the arbitration clauses in including or excluding the present causes of action in plaintiff's complaint, and the enforceability of the arbitration clauses in light of general principles of contract formation. Keeping in mind the parties' specific arguments, the Court conducts a two-step analysis pursuant to Chapter Two of the FAA to resolve the issues raised by the parties with respect to the terms of the '005 and the '437 P & I Policies.

### 1. The First Stage Of The Inquiry— Four Preliminary Questions Regarding Arbitrability

The Court begins the first step of its inquiry by resolving the following four preliminary questions:

(i) Is there an agreement in writing to arbitrate the subject of the dispute? *See* Convention. Article II §§ 1–2; (ii) Does the agreement provide for arbitration in the territory of a signatory of the Convention? *See* Convention, Article I §§ 1 & 3; 9 U.S.C. § 206; (iii) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial? *See* Convention, Article I § 3; 9 U.S.C. § 202; (iv) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states? *See* 9 U.S.C. § 202.

*Ledee*, 684 F.2d at 186–87 (citations altered); *Sedco*, 767 F.2d at 1145 (5th Cir. 1985); *Tennessee Imports, Inc.*, 745 F.Supp. at 1321; *Corcoran v. Ardra Ins. Co., Ltd.*, 657 F.Supp. 1223, 1227 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 31 (2d Cir.1988). In the present case, the second, third and fourth criteria are clearly satisfied, as the purported agreement undisputedly provides for arbitration in London and the United Kingdom is a signatory to the Convention, *see* note foll. 9 U.S.C. § 201; (Pls.' Resp. to Ct.'s Ord. at 3); the parties do not dispute that their relationship is a "commercial" relationship and that it arises out of the provision of marine insurance and underwriting services by defendants to plaintiffs (*see* Compl. at ¶¶ 35–38; Jones Decl. at ¶¶ 4–6); and both agree that defendants are corporations existing under the laws of England and Wales (*see* Compl. at ¶¶ 24–25; Jones Decl. at ¶¶ 1–3). The central disputed issue that remains, therefore, is whether the '005 and the '437 P & I policies, viewed in light of the parties' business relationship, constitute an "agreement in writing" to arbitrate the "subject of the dispute" under the Convention.

*(i) Agreement In Writing:* Plaintiffs rely on Article II, section 2 of the Convention to argue the arbitral clauses in the P & I policies do not conform to the "agreement in writing" provision of the Conven-

tion insofar as they are not signed nor contained in an exchange of letters or telegrams between the parties. (*See* Pls.' Opp'n at 12 ("The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.") (citing Art. II § 2).) Defendants argue that the arbitral clauses fall under the Convention because Congress broadened Article II, section 2 to give a more expansive view of what constitutes "an agreement in writing" pursuant to 9 U.S.C. § 202. (*See* Defs.' Reply at 9; Defs.' Supp. Reply at 1–2.) In the alternative, defendants argue that the arbitral clauses also fall within the stringent requirements of Article II, section 2 of the Convention. The Court first addresses defendants' novel argument that the Convention is not exhaustive in defining an "agreement in writing," and then determines whether the arbitral clauses meet the stringent requirements of the Article II, section 2 of the Convention.

(a) The Term "Agreement In Writing". Is Defined Solely By Article II, Section 2 Of The Convention, And Is Not Given Any Broadened Scope By Congress's Implementing Legislation, Specifically 9 U.S.C. § 202

■ Defendants argue that the arbitral clauses at issue fall under the Convention because the definition of "agreement in writing" in Article II section 2 of the Convention is broadened by Congress's implementing legislation, specifically 9 U.S.C. § 202. However, the Court finds that the defendants' argument that 9 U.S.C. § 202 specifically modifies and broadens Article II, section 2 of the Convention is erroneous for several reasons.

First, Congress has admittedly provided that the Convention would be "enforced in the United States courts *in accordance with* this chapter," 9 U.S.C. § 201 (emphasis added), but there is no evidence that it broadened the self-sufficient definition of "an agreement in writing" in Article II section 2 of the Convention through the language of 9 U.S.C. § 202. In fact, the language of 9 U.S.C. § 202 tracks exactly the language of another section of Article II of the Convention, and *limits* it instead of broadening it. Section 202 of the FAA provides, in relevant part:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention.

9 U.S.C. § 202. As an unmistakable parallel, Article II, section *1* of the Convention provides:

Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

Art. II § 1. In other words, section 202, like Article II, section 1, deals with the "relationship" between the parties which gives rise to an agreement in writing subject to the Convention, and limits the Convention insofar as it makes it applicable to *only* those legal relationships which are considered "commercial" under the national law of the United States, specifically, 9 U.S.C. § 2.[2]

2. Likewise, the second of the two declarations following the United States' ratification of the Convention only makes a "minor modification" to the Convention, *see Ministry of Defense*, 887 F.2d at 1362 (identifying the declarations by the United States simultaneous to adopting the Convention as the source of the "minor modifications" that Congress imposed

when it made the Convention enforceable in the courts of the United States), with respect to the applicability of the Convention to certain relationships between the parties giving rise to the arbitration agreement, and not the actual "agreement in writing" itself. *See* n. 29 foll. 9 U.S.C. § 201 ("The United States of America will apply the Convention *only to*

Second, the fact that section 202 has no direct relevance to what constitutes an "agreement in writing" as defined by Article II section 2 of the Convention is supported by the very cases relied upon by defendants for the proposition that the Court make a very limited inquiry with respect to referring a dispute to arbitration in a case arising under the Convention. *See, e.g., Ledee,* 684 F.2d at 186–87; *Sedco,* 767 F.2d at 1145 (5th Cir.1985); *Tennessee Imports, Inc.,* 745 F.Supp. at 1321; *Corcoran,* 657 F.Supp. at 1227. As previously noted, these cases require the Court to ask four preliminary questions, each of which relate to specific language in the text of the Convention or Chapter 2 of the FAA. The first of these questions, that is, whether "there is an agreement in writing to arbitrate the subject of the dispute," directs the Court to look only at Article II, section 2 of the Convention, and not to any modifying language in 9 U.S.C. § 202. To the contrary, each of the subsequent questions direct the Court to look at provisions of Chapter 2 of the FAA, including two questions which refer the Court specifically to 9 U.S.C. § 202 in determining whether the parties' relationship is a "commercial" one and whether one of the parties is not an American citizen. Therefore, rather than inverting the step-by-step inquiry that applicable law delineates, the Court finds that a determination of what constitutes an "agreement in writing to arbitrate the subject of the dispute" stands independent of any implementing legislation in Chapter 2 of the FAA.

Third, no case relied upon by the parties in which the term "agreement in writing" was disputed has looked to anything but Article II, section 2 of the Convention in construing the meaning of that term. *See Sphere Drake Ins. PLC v. Marine Towing, Inc.,* 16 F.3d 666 (5th Cir.), *cert. denied* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Kahn Lucas,* 186 F.3d at 215–18. In fact, in both these cases, the Fifth and the Second Circuits respectively determined the fundamental issue of their subject matter jurisdiction based solely on whether the definition of "agreement in writing" under the Convention encompassed the arbitral clauses at issue. If defendants argument has merit, this Court would have to find persuasive a proposition that it actually finds incredulous—that neither of these courts would have noted that their federal subject matter jurisdiction was co-extensive with the broader language of "agreements" in 9 U.S.C. § 202, and not solely with the stringent requirements of the Convention.[3]

Fourth, defendants erroneously argue that the following words in Article II section 2 of the Convention "plainly indicate" that what follows them is not intended to be exhaustive: "The term 'agreement in writing' *shall include* an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." (Defs.' Supp. Reply at 1 (emphasis in original) (citation omitted).) In fact, the phrase "shall include" is *not* plainly indicative of defendants' interpretation, since it is equally plausible that the word "shall" leaves courts with little discretion in defining an "agreement in writing" and directs

*differences* arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States.").

**3.** This is especially true because the courts' right, indeed obligation, to *sua sponte* raise the non-waivable issue of their subject matter jurisdiction is well-established, *see Dyer v. Greif Bros., Inc.,* 766 F.2d 398, 401 (9th Cir. 1985) (holding it an "elementary" principle that the subject matter jurisdiction of the district court is not a waivable matter and may

be raised *at any time* by one of the parties or *sua sponte* by the trial or reviewing court), and independent of the general restriction that appellate courts may only consider those arguments properly preserved and raised by the parties on appeal, *see Rothman v. Hospital Serv. of S. Cal.,* 510 F.2d 956, 960 (9th Cir. 1975) (holding that, where the issue is first raised in a motion made after the entry of the district court's final judgment, the issue "was not suitably raised below" and is not properly before the appellate Court).

that each "agreement in writing" *must* include the elements that follow. *See, e.g., Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (noting that "shall" and "must" are virtually synonymous under traditional principles of statutory construction and are both words of "an unmistakably mandatory character"), *limited on other grounds Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Hicks v. Miranda,* 422 U.S. 332, 352, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (Burger, C.J., concurring) ("It is well settled that 'shall' means 'must'."). Therefore, consistent with the applicable cases, Article II section 2 does not outline the minimum but the mandatory requirement of what constitutes an "agreement in writing" under the Convention.

Finally, even the undeniable fact that the highest Court and the leading experts in the United Kingdom have recognized that the English Arbitration Acts implementing the Convention broaden the definition of an "agreement in writing" found in Article II section 2 of the Convention is of limited persuasive value. (*See* Attach. to Decl. of Elizabeth A. Kendrick (4/1/4/00), Supp. Decl. of Jonathan Gilman at ¶¶ 3, 7-10) (stating that Judges and the Departmental Advisory Committee on Arbitration Law Courts in England have recognized that Article II section 2 of the Convention is non-exhaustive in defining an "agreement in writing"). Since there is no recognition by any court or expert in the United States that Chapter 2 of the FAA performs a similar broadening function as the English Arbitration Acts, the defendants' at most direct this Court's attention to English law in construing these parties' expectations as to what constitutes an "agreement in writing." This the Court has already recognized, as evidenced by its previous Order requesting supplemental briefing. Further, the subsequent analysis in applying the term "agreement in writing" to the facts of this case adequately takes into consideration the parties' expectation. Therefore, although cognizant that

Congress's goal in implementing the Convention was to encourage uniformity with respect to the enforcement of foreign arbitration agreements and foreign arbitral awards, this Court must find that Article II of the Convention exhaustively defines what constitutes an "agreement in writing" under Chapter 2 of the FAA despite defendants' argument to the contrary.

*(b) The Arbitral Clause At Issue Meets The Stringent Definition Of The Term "Agreement In Writing" Under The Convention And Relevant Law*

Defendants argue that even if the Court were to find that Article II, section 2 of the Convention is the sole interpretive tool for construing the term "agreement in writing," the arbitral clauses at issue fall within that definition. Article II, section 2 provides:

> The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

Convention, Art. II § 2. Neither the Ninth Circuit nor the Supreme Court has interpreted this language of the Convention. Moreover, there is a split of authority between the Courts which have interpreted and applied this definition of "agreement in writing" under the Convention. In *Sphere Drake,* 16 F.3d at 669, the Fifth Circuit rejected defendants' argument that an "agreement in writing" is defined under the Convention "only as 1) a contract or other written agreement signed by the parties or 2) an exchange of correspondence between the parties demonstrating consent to arbitrate." Instead, the Fifth Circuit concluded that it "would outline the Convention definition of 'agreement in writing' to include either (1) an arbitral clause in a contract or (2) an arbitration agreement, (a) signed by the parties or (b) contained in an exchange of letters or telegrams." *Id.* In other words, the Fifth

Circuit interpreted the Article II section 2 of the Convention as imposing the signature and exchange of letters requirements only where the parties' consent to arbitrate is evidenced by an independent agreement to arbitrate, and not an arbitral clause in a contract. *Id.* (holding that the foreign insurer and the domestic assured had an "agreement in writing" within the meaning of the Convention even though the P & I policy at issue, which covered the insured's vessels and contained the arbitral clause, was not signed).

■ To the contrary, the Second Circuit concluded in *Kahn Lucas* that the modifying phrase "signed by the parties or contained in an exchange of letters or telegrams" applies to both "an arbitral clause in a contract" and "an arbitration agreement." 186 F.3d at 218. This conclusion by the Second Circuit followed an exhaustive analysis by the Court of the language of Article II section 2 of the Convention in light of (1) the principles applicable to the interpretation of the plain language of a treaty, including the rules of grammatical construction with respect to modifying phrases following a comma, *see id.* at 216–17; (2) the consistency of its interpretation with three of the remaining four official language versions of the Convention—the Spanish-, French-, and Chinese-language versions, *see id.* at 217–18 (excluding Russian language version); (3) the legislative history of the text of article II, as reported by the United Nation Conference's Working Group, *see id.* at 218 (citations omitted); and (4) the applicable principle under federal law that the Convention "should be interpreted broadly to effectuate its recognition and enforcement purposes," *id.* at 218 (quoting *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 933 (2d Cir.1983)). Due to the inherent persuasiveness of the Second Circuit's reasoning and because of that Court's comprehensive analysis relative to the Fifth Circuit's conclusory interpretation in *Sphere Drake,* the Court finds that the interpretation given to Article II, section 2 of the Convention in *Kahn Lucas* controls here. *See also Sen Mar. Inc. v. Tiger Petroleum Corp.,* 774 F.Supp. 879 (S.D.N.Y.1991) (cited approvingly in *Kahn Lucas* for its holding that the arbitral clause in the parties' contract was invalid under the Convention where the arbitration term appeared only in a telex that party to be charged did not sign and to which the party objected).[4]

■ Having concluded that both an arbitral clause and an agreement in writing must be found either in a signed writing or an exchange of letters under the Convention, the Court turns to the application of the Convention to the facts of the present case. Here, agreeing with defendants that the relevant "agreement in writing" is not an independent arbitration agreement but an arbitral clause in the contractual P & I policies, the plaintiffs argue that the conduct of the parties in negotiating and purchasing the P & I policies does not satisfy either the signature or the exchange of letters requirement of the Convention. However, the Court finds that conduct of the parties in negotiating the '005 and the '437 P & I policies affirmatively mani-

---

4. Defendants argue that *Kahn Lucas* is factually distinguishable from this case because there was no manifestation of assent in that case, whereas *Sphere Drake* is more persuasive because it also involved an arbitral clause in a P & I Policy. However, the Court's comparison of the reasoning in *Kahn Lucas* and *Sphere Drake,* and its ultimate application of the legal principles in *Kahn Lucas* in this case is limited to those factors which interpret the term "agreement in writing" under the Convention without respect to any factual considerations at hand. Indeed, as noted below, what this Court finds convincing about the Second Circuit's reasoning in *Kahn Lucas* is that Court's exhaustive legal analysis based upon grammatical rules of construction and such interpretive tools as the drafters' intent and the versions of the Convention existing in four other official languages besides English. Accordingly, the Court agrees that *Sphere Drake* is more factually similar to this case, and that *Kahn Lucas* is distinguishable, but finds that these factual arguments are irrelevant to the application of these cases for their interpretation of a term in the Convention as a matter of law.

fests their consent to the arbitral clauses within the meaning of the "exchange of letters or telegrams" requirement under the Convention.

The relevant conduct of the parties in negotiating both the '005 and the '437 P & I Policy is explained in detail in the two declarations of Mark Jones, who was employed as a P & I underwriter by defendants between 1991 and 1997. (*See* Jones Decl. at ¶ 1; Second Jones Decl. (1/12/00) at ¶ 1.) As per "customary" practice in the London insurance market, the assured plaintiffs in the present case were represented in London by their brokers, Robert Barrow Ltd., subsequently known as Blackall Green Ltd. in order to deal with the London insurers on plaintiffs' behalf. (*See* Jones Decl. at 4; Pls.' Resp. to Ct.'s Ord. (3/24/00) at 8.) Each year, the plaintiffs' London brokers submitted the assureds' request for a quotation to defendants by the means of a document known as a "slip." (Jones Decl. at ¶ 4; Pls.' Resp. to Ct.'s Ord. at ¶ 3.) The slip detailed the terms and policy type requested by the assureds and requested a quotation of the terms, conditions, and premium for a certain type of marine insurance from defendants. (*See* Jones Decl. at ¶ 4.) After negotiating protection and indemnity coverage for plaintiffs' vessels based on defendants' standard form SD350 and SD352, in effect between 1991–94 and 1995 respectively, defendants effected the contracts of insurance through the following assent: affixing their stamp to the broker's slip and endorsing it with, among other things, the word "Bound," the date, and the applicable policy number ('005 or '437). (*See* Jones Decl. ¶ 4; Second Jones Decl. at ¶¶ 3–6; Ex. A to Second Jones Decl. "Blackwell Green Ltd. 'slips'.") The standard form SD350 and SD352, referenced in the "Conditions" section of the slips, (*see* Ex. A to Second Jones Decl.), in turn contained the London arbitral clauses at issue in Section A of their General Terms and Policy Conditions. (*See* Jones Decl. at ¶ 5; Second Jones Decl. at ¶ 9; Ex. C to Second Jones Decl.) As the final step, defendants issued Certificates of Insurance to the assureds' brokers to confirm the terms of the insurance, including reference to specific clauses in the standard form policy to reflect the parties' bargained for alterations and deletions. (*See* Second Jones Decl. at ¶¶ 5 & 8.)

Without disputing the sequence of events as described by declarant Mark Jones, plaintiffs make specific objection to certain statements by him, and the import of the parties' conduct as assent akin to a signature or an exchange of letters under English law. First, the Court rejects the plaintiffs' objection that Mark Jones' statement regarding the brokers' knowledge of standard London arbitration clauses is conclusory and lacking in foundation. (*See* Pls.' Resp. to Ct.'s Ord. at 8.) As an underwriter employed by defendants who dealt directly with the plaintiffs' London brokers, Mark Jones lays the foundation for his statement that the plaintiffs' brokers in this case were aware of standard London arbitration clauses in the form contracts used by the parties. Moreover, the Court finds disingenuous plaintiffs' assertion that they are unable to represent whether London brokers are generally familiar with the language employed by defendants in the arbitral clauses incorporated in their form policies SD350 and SD352 because of the unavailability Dick Sturgeon, the former employee of their London broker Blackwell Green. (*See* Pls.' Resp. to Ct.'s Ord. at 8.) Admittedly, Mr. Sturgeon's knowledge as the broker actually involved on plaintiffs' behalf in negotiating the P & I policies with defendants would be the "best source of information" or most competent evidence regarding this issue. (*Id.* at 8, 12.) However, given Mr. Sturgeon's unavailability and notwithstanding plaintiffs' conclusory remark that "Mr. Sturgeon, therefore, should be deposed," (*id.*), plaintiffs should offer at least general evidence to dispute declarant Mark Jones's statement regarding the brokers' knowledge. Plaintiffs' failure to offer such evidence, even through the declaration of their Lon-

don solicitor Angus Stuart, a practitioner in the field of insurance and reinsurance litigation and arbitration,[5] is telling, and leaves undisputed the defendants' contention that "London arbitration clauses are ubiquitous in the London marine insurance market, and a competent and diligent London broker would be familiar with all important terms of the insurance contract, obviously including arbitration clauses." (Defs.' Supp. Reply at 5.)[6]

Next, the Court finds that the import of the parties' conduct must be construed in accordance with English law, not because the parties' use an English choice-of-law provision to govern the P & I policies or a London arbitration clause to govern the arbitral clause, but because the use of the slips and the conduct which must either constitute a "signature" or an "exchange of letters or telegrams" under the Convention *occurred* in London. Thus, although the Court affirms that the Convention is the supreme law exclusively applicable to the Court's inquiry as to the existence of an "agreement in writing," (*see also Order Requesting Supp. Briefing* (2/17/00) at 2), the fact that the manifestation of assent here occurred in London makes federal law inapposite to that portion of the Court's analysis.[7] Indeed, the Court is aware of no case in which an entity existing under the laws of the United States provided the P & I insurance and underwriting coverage, or where a "slip" was construed by a competent court of U.S. jurisdiction in accordance with federal law applying the Convention. Therefore, the Court turns to the parties arguments regarding the import of the parties' negotiating conduct in the present case under English law.

Defendants argue, through their expert Jonathan Gilman, Q.C., that a party's letterhead is treated as his signature under English law, albeit in a context independent of the application of the Article II, section 2 of the Convention. (*See* Decl. of Jonathan Gilman ("Gilman Decl.") (1/12/00); Supp. Gilman Decl. (4/14/00) at ¶¶ 11–12.) Despite the Court's invitation to plaintiffs to dispute Mr. Gilman's expertise or opinions, plaintiffs do not dispute this. However, plaintiffs argue that if the slips are themselves the "signed" contracts, then they do not meet the preliminary requirement of an "agreement in

---

**5.** (*See* Curriculum Vitae, Attach. to Decl. of Angus Stuart ("Stuart Decl.") (3/24/00).)

**6.** Moreover, defendants' expert Jonathan Gilman, Q.C., offers his expert opinion of what an ordinarily competent marine broker operating in the London market would know regarding arbitral clauses, and supports the statements in Mark Jones declaration. (*See* Supp. Decl. of Jonathan Gilman ("Supp. Gilman Decl.") (4/18/00) at ¶¶ 13–14.) Although the plaintiffs orally objected to these portions of Mr. Gilman's declaration at the hearing on April 24, 2000, the Court finds that Mr. Gilman has established a sufficient foundation based on his experience of thirty years in the field of marine insurance and arbitration in London, and that his opinion is properly introduced by defendants for the general proposition that it would be anomalous for plaintiffs' brokers not to know of the arbitral clauses at issue. (*See* Curriculam Vitae, Attach. to Supp. Gilman Decl.) Certainly, plaintiffs had the opportunity to rebut Mr. Gilman's opinion with a statement from their expert that London brokers either do not know of the arbitral clauses in standard form P & I policies, or that Mr. Gilman has little or no basis to opine on what a marine broker in the marine insurance business in the London market knows with respect to arbitral clauses. In the absence of either, plaintiffs' objections are unpersuasive.

**7.** Although it is the generally accepted custom and usage for marine underwriters to deal with insurance brokers as agents of the insured, this practice was not established by an act of Congress nor has it risen to the stature of a judicially established federal admiralty rule. *See Centennial Ins. Co. v. Parnell*, 83 So.2d 688 (Fla.1955); *Hauser v. American Cent. Ins. Co.*, 216 F.Supp. 318 (E.D.La.1963). In the absence of federal admiralty law on the issue, the law of the state with the greatest interest in the issue controls. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Ahmed v. Am. S.S. Mut. Protection & Indem. Ass'n*, 640 F.2d 993 (9th Cir.1981); *Edinburgh Assur. Co. v. R.L. Burns Corp.*, 479 F.Supp. 138 (C.D.Cal. 1979), *aff'd in relevant part*, 669 F.2d 1259 (9th Cir.1982).

writing" insofar as the signed slips do not expressly include the arbitral clauses at issue nor are the slips the stand-alone arbitration agreements. (*See* Pls.' Resp. to Ct.'s Ord. at 5.) The Court agrees. Clearly, the signed slips are not the stand-alone arbitration agreements. Moreover, while the reference in the slips to the standard form P & I policies issued by defendants incorporates the arbitral clauses in those policies by reference, and defendants accepted the slips by their stamp, neither party signed the arbitral clause itself, as the Convention requires. Therefore, the only way that the arbitral clauses at issue could be an "agreement in writing" under Article II section 2 of the Convention is if they were contained in an exchange of letters or telegrams between the parties.[8]

This is precisely the case here because the brokers' slips and the defendants' certificates of insurance constitute an exchange of letters evidencing an assent to a contract—the '005 and '437 P & I policies—which contain the arbitration clauses at issue. None of plaintiffs' objections to this conclusion are persuasive. First, plaintiffs argue that the Convention does not specifically reference "slips" as "letters or telegrams" even though the practice of presenting slips to underwriters for their signatures in the London insurance market was well-established at the time the Convention was drafted. (*See* Pls.' Supp. Resp. to Ct.'s Ord. at 5 & n. 4.) However, neither does the Convention reference a "facsimile," a "telex," or an "e-mail."[9] Under plaintiffs' unduly restrictive definition, only a written message sent in an envelope with a signature or a message transmitted by telegraph would satisfy the letter and telegram requirements respectively. (*See* Pls.' Resp. to Ct.'s Ord. at 7, n. 6.) However, the Court finds that Article II section 2 of the Convention could not have intended to exclude all other forms of written communications regularly utilized to conduct commerce in the various signatory nations by failing to provide an exhaustive list of "letters" or "telegrams."

Second, plaintiffs argue that the process described by defendants "was not an 'exchange' of anything" because in response to plaintiffs' request for the "underwriting file," defendants conceded that the only one document—the brokers' slips—exists. (*Id.* (citing Ashes. D & E to Decl. of Edward Walton ("Walton Decl.").).) However, the "certificates of insurance" that defendants exchanged to confirm the terms negotiated pursuant to the brokers' slips are attached to the Declaration of Mark Jones, and contain specific references to the form policies and clauses deleted or excluded therein. (*See* Ex. B to Jones Decl., Entitled "Sphere Drake, Certificate of Insurance Number ... attach-

---

8. Plaintiffs also take exception to the defendants' reliance on the Uniform Commercial Code ("U.C.C.") for the argument that the presentation of documents bearing a tendering party's name satisfies a signature requirement. (*See* Pls.' Resp. to Ct.'s Ord. at 6 (citations to cases cited by defendants omitted).) In light of the Court's conclusion that the signature requirement is met, the Court addresses this argument only briefly to note its agreement with plaintiffs. As plaintiffs argue, the unique doctrine referenced by the defendants—the "merchant's exception" to the statute of frauds under the U.C.C. § 2-201—developed as a result of a specific concern perceived by the drafters of the U.C.C. which has no connection to the parties' relationship here. *See Cox Eng'g, Inc. v. Funston Mach. and Supply Co.*, 749 S.W.2d 508, 510 (Tex.App.1988) (noting that 'specific evil'

sought to be corrected by the merchant's exception was to make a contract between merchants enforceable by both the party making the oral offer and the party confirming its acceptance in writing). Here, once an enforceable arbitration clause is found to exist, there is no question that it would be enforceable by either party.

9. Likewise, the Convention does not explain whether a "seal" or the "X" or "thumb print" of an illiterate principal constitutes a "signature" for the purposes of Article II, section 2. As the term "signature" is construed with respect to the customary practices, so is the phrase "exchange of letters or telegrams" construed in light of prevalent and accepted practices, and without regard for technical objections.

ing to and forming part of Marine Insurance Policy (SD350) [or (SD352) ].") Third, plaintiffs argue that even if the slips from their agents and the certificates of insurance from defendants constituted an exchange of letters, they do not satisfy the requirement that the arbitral clause be "contained" in one of the letters. Notwithstanding plaintiff's objection, the Court finds that nothing in the Convention prevents incorporation of the arbitral clause by reference to the P & I policies in which it is included. This is especially the case where the plaintiffs' agents themselves initiated the process of negotiation by referencing only those specific terms in the standard P & I policies which they sought to change or delete. It is completely logical, then, for the responsive certificates of insurance to confirm only the changes that plaintiffs' agents highlight, without specifically including other terms that both parties seem to agree on. In fact, it is disingenuous of plaintiffs to argue that defendants' failure to attach the P & I policies to the certificates of insurance prevents reference by incorporation because both parties seem to have been perfectly aware of the standard form contracts from which they sought changes through negotiations.[10]

■ Finally, plaintiffs object that "nowhere in the Convention is the term 'party' defined to include not only the party against whom the arbitral clause is sought to be enforced but also that party's independent agents or representatives." (Pls.' Resp. to Ct.'s Ord. at 6.) The Court need not even countenance such an argument, or the corollary evidence that President Lawrence A. Zuanich was not aware of the arbitral clauses, in light of the well-established proposition under federal law as well as English law that a broker's knowledge and acts are binding upon the assured. *See Lien Ho Hsing Steel Enter. Co., Ltd. v. Weihtag,* 738 F.2d 1455, 1458 (9th Cir.1984) (imputing brokers' knowledge a foreign forum selection clause in a marine insurance policy procured for the assured by the broker and directing assured to direct its objections to the clause "to its brokers, rather than to [the defendant insurers]."); *Howard Fuel v. Lloyd's Underwriters,* 588 F.Supp. 1103, 1108 (S.D.N.Y.1984); (Stuart Decl. at 7; Supp. Gilman Decl. at ¶¶ 12, 22 (citations to English cases omitted)).[11] In sum, the par-

10. At the hearing on April 24, 2000, plaintiffs erroneously relied on the facts of *Kahn Lucas* to argue that incorporation by reference does not satisfy the requirement of the Convention that the arbitral clause be contained in an exchange of letters or telegrams. The Second Circuit in *Kahn Lucas* held that the printing of the arbitral clause behind the purchase orders did not satisfy the signature requirements of the Convention insofar as the purchase orders were only signed by the party seeking to invoke arbitration, and not by the defendant who opposed the motion to compel arbitration. *See Kahn Lucas,* 186 F.3d at 218. However, the Court declined to address whether the parties' transaction constituted an "exchange of letters or telegrams" because that issue was not raised by the parties. *See id.* ("Kahn Lucas does not contend that the Purchase Orders, even together with Lark's Confirmation of Order forms, represent 'an arbitral clause in a contract ... contained in an exchange of letters or telegrams.'") Finally, even if the parties had raised the issue, the fact that the parties' contract in *Kahn Lucas* was a unilateral or "acceptance by

performance" contract, *see id.* at 212, is completely different from the P & I policies in effect between the parties here. In other words, while there was no *exchange* of documents in *Kahn Lucas*, the parties here clearly exchanged the slip and the Certificates of Insurance, both of which referenced the P & I policies which contain the arbitral clause.

11. Likewise, Lawrence A. Zuanich's statement that the change in language between the two sets of policies in effect between the parties during 1991–92 (SD350) and 1992–95(SD352) were not evidenced by notification, assent, or consideration is unpersuasive since it is the intent of the brokers as agents of the plaintiffs which controls here. (*See* Decl. of Lawrence A. Zuanich at ¶ 6; Pls.' Opp'n at 9.) The Court also agrees with defendants' argument at the hearing on April 24, 2000 that if a president's ignorance of a term in a particular contract were the definitive evidence that the term was not assented to by the parties, then all presidents would studiously avoid knowing the terms of the con-

ties here exchanged written communications manifesting assent to a contract which contains the arbitral clauses, thus satisfying Article II section 2 of the Convention.

Accordingly, the Court finds the existence of a valid agreement in writing between these parties under the Convention.

*(ii) Scope Of Arbitral Clause To The Present "Subject Of The Dispute":* Having found the existence of a valid agreement to arbitrate, the Court must determine whether the scope of the arbitral clauses—as evidenced by their specific language—includes the subject of the parties' present dispute—as evidenced by the causes of action in plaintiffs' complaint—within the meaning of the Convention. Preliminarily, the Court addresses the question of which law governs its inquiry, a determination that both parties' and their experts on English law leave to the Court.

*(a) Whether The Arbitral Clauses At Issue Encompass The Subject Of The Parties' Present Dispute Is A Matter Governed By The Federal Substantive Law Of Arbitrability*

■ The Supreme Court has held that where the FAA applies, the determination of the scope of an agreement to arbitrate applies the " 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]'." *Mitsubishi Motors Corp.,* 473 U.S. at 626, 105 S.Ct. 3346 (quoting *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24, 103 S.Ct. 927). As noted above, and undisputed by the parties, the Convention and its implementing legislation, Chapter 2 of the FAA, applies here.

Admittedly, there is a colorable argument that either the choice-of-law provision governing the P & I policies [12] or the reference of disputes "to arbitration in London" in the arbitral clauses themselves [13] subject the scope of the arbitration clause to English law. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.,* 141 F.3d 243, 248 n. 6 (5th Cir.1998) (rejecting argument that, notwithstanding agreement's choice-of-law provision under Chapter 1 of the FAA, "substantive federal law governs the scope of an arbitration clause whenever the agreement involves commerce"). However, where, as here, the Convention and Chapter 2 of the FAA provide an independent basis for this Court's subject matter jurisdiction, *see* 9 U.S.C. § 203, they provide an "overriding basis" for why the law under which the case "arises"—the Convention and its implementing legislation—must apply to the question of whether these parties agreed to arbitrate their disputes. *See Filanto, S.p.A.,* 789 F.Supp. at 1234–36 (noting that the "Convention, as a treaty, is the supreme law of the land, U.S. Const. art. VI cl. 2, and controls any case in any American court falling within its sphere of application" such that "any dispute involving international commercial arbitration which meets the Convention's jurisdictional requirements, whether brought in state or federal court, must be resolved with reference to that instrument"); *Kamaya Co., Ltd. v. American Property Consultants, Ltd.,* 91 Wash.App. 703, 713–14, 959 P.2d 1140 (1998) (noting that despite choice of law and forum selection clauses, it is "axiomatic that courts must have some law to apply when *initially* determining whether the parties agreed to arbitrate a particular

tracts to which their respective agents signed or negotiated.

**12.** (*See* Notices of Arbitration in January 1999 attach to Decl. of Bryn D. Thomas (12/6/99) (Ex. B. to Decl. of Elizabeth Kendrick) at ¶ 59 ("The Policy of Insurance shall be governed by, and construed in accordance with English law.") (quoting '005 P & I Policy (SD350) during 1991–92).)

**13.** (*See generally* 1991 (SD350) (arbitration in London); 1992 (SD350) (same); 1993(SD352) (arbitration in London in accordance with the Arbitration Acts 1950 to 1979);1994(SD352) (same); and 1995(SD352) (same) (Attach. to Jones Decl.).)

dispute" and finding that law in the analytical framework of the FAA); *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir.1972) ("Once a dispute is covered by the [federal Arbitration] Act, federal law applies to all questions of [the arbitration agreement's] interpretation, construction, validity, revocability, and enforceability.").

 Moreover, in *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39 (3d Cir.1978), the Third Circuit decided that neither West German law nor Pennsylvania law applied to the question of whether the parties agreed to arbitrate their dispute, which arose under the Convention. *Id.* at 43. Instead, the Court distinguished cases where the federal court sits pursuant to diversity jurisdiction from cases where it has federal question jurisdiction under the Convention and 9 U.S.C. § 206,[14] and concluded as follows:

> When a contract involves 'commerce,' as this one does, whether a 'suit or proceeding is referable to arbitration ... under an agreement [to arbitrate]' pursuant to the federal Arbitration Act, 9 U.S.C. § 3, or to the Convention [ ], Art. II, § 3 and 9 U.S.C. § 206, is clearly a matter of federal substantive law.

*Id.*[15] This application of the federal law is consistent with the parties intent, insofar as the choice-of-law provision or the forum selection clause in an international arbitration agreement is not rendered superfluous, but referred to the arbitration panel for resolution. *See In the Matter of Arbitration between Zurich Ins. Co. v. Ennia Gen. Ins. Co.*, 882 F.Supp. 1438, 1440 (S.D.N.Y.1995) ("[T]he issue of the law to be applied in the arbitration proceeding—including the question whether the choice of law clause in the Management Agreement applies—is for the arbitration panel."); *accord ATSA of Cal., Inc. v. Continental Ins. Co.*, 702 F.2d 172, 175 (9th Cir.1983) ("[W]hen parties agree to submit disputes to arbitration, it is presumed that the arbitrator is authorized to determine all issues of law and fact necessary to resolve the dispute."), *amended by* 754 F.2d 1394 (9th Cir.1985).[16] Therefore, notwithstanding the Court's request for sup-

**14.** *See Becker Autoradio*, 585 F.2d at 43, n. 9 (distinguishing *Cook v. Kuljian Corp.*, 201 F.Supp. 531, 535 (E.D.Pa.1962), supplementary op., 209 F.Supp. 478 (E.D.Pa.1962), *aff'd* 317 F.2d 412 (3d Cir.1963) (*per curiam* ), as a diversity case in which the court held that the question of the enforceability of an arbitration award in a contract made and performed in India was a choice of law question governed by Pennsylvania's choice of law rules because the agreement in Cook did "not relate to a maritime transaction or involve interstate or foreign commerce" and therefore, the federal Arbitration Act was "without application."); *cf. Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1002–03 (9th Cir.1987) (noting that although the general rule is "that a federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)), where jurisdiction is based on the existence of a federal question, federal common law applies even to the choice-of-law analysis.

**15.** *But see McDermott Int'l v. Lloyds Underwriters of London*, 944 F.2d 1199, 1210–11 (5th Cir.1991) (noting conflicting authorities on whether state courts must apply FAA and stating that "state courts do not necessarily have to stay litigation or compel arbitration under the Convention either"); *accord Corcoran*, 842 F.2d at 35. Although both the Fifth and the Second Circuits in these cases disagree with the Court, neither mentions Article VI of the Constitution, which makes treaties the highest law of the land, and neither satisfactorily addresses why the law under which an action "arises" does not govern the action.

**16.** Finally, it is important to note that unless parties clearly evidence an intent to arbitrate the arbitrability of the dispute, the question remains a judicial determination applying the federal substantive law of arbitrability. *See Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Achille Lauro*, 712 F.2d 50 (3d Cir.1983) (resolving the ambiguity in Article II, section 3 of the Convention regarding which law applies to the inquiry of whether an agreement to arbitrate is "null and void" as calling for the application of the law of the forum or other internationally recognized principles).

plemental briefing on the parties' intent to be bound by English law, the choice-of-law provision in the '005 and the '437 P & I policies, and the express provision for arbitration in London in the arbitral clauses, the Court finds that federal law applies to the Court's preliminary inquiry as to the scope of the arbitration clauses.

*(b) The Language Of The Arbitral Clauses In '005 P & I Policy In Effect During 1991–92 Is Construed Broadly Under Applicable Law And The Guiding Principles Therein, And The Language Of The Arbitral Clause In The '437 P & I Policies In Effect During 1993–1995 Is Even Broader*

Here, it is undisputed that two sets of policies were in effect between the parties during the relevant time period. Accordingly, the Court proceeds to construe the language of the arbitral clauses in both sets of policies to determine if the parties agreed to submit the present dispute to arbitration in light of the following four guiding principles:

(1) the duty to submit a matter to arbitration arises from the contract itself; (2) the question of whether parties have agreed to arbitrate a dispute is a judicial one unless the parties clearly provide otherwise; (3) a court should not determine the underlying merits of a dispute in determining the arbitrability of an issue; and (4) arbitration of disputes is favored by the courts.

*W.A. Botting Plumbing & Heating Co. v. Constructors–Pamco,* 47 Wash.App. 681, 683, 736 P.2d 1100 (1987) (citing *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1063 (2d Cir.1993) ("The federal policy favoring arbitration is even stronger in the context of international transactions.").

■ First, between February 20, 1991 to May 20, 1992, the '005 P & I policy governed the parties' relationship (*see* Compl. at ¶ 38), and provided that "[a]ny difference or dispute between the Company and the Assured concerning any claim under the Policy of Insurance" shall be "referred to arbitration in London." (*See* 1991(SD350) at ¶¶ 51–52; 1992 (SD350) at ¶¶ 52–53 (Attach. to Jones Decl.); *see* Pl.'s Opp'n at 8.) Plaintiffs argue that such language has been construed to constitute a "narrow" arbitral clause by the Ninth Circuit in *Mediterranean Enters., Inc. v. Ssangyong Corp.,* 708 F.2d 1458 (9th Cir. 1983). Defendants respond that contrary to the plaintiffs' contention, the arbitration clauses of the '005 P & I Policies are much broader than the arbitration clause in *Mediterranean Enters.,* and that regardless, both the Supreme Court and the Ninth Circuit have since recognized a shift in the law favoring the expansive construction of arbitration clauses.

■ The Court finds merit in both of defendants' arguments. First, the Court finds that *Mediterranean Enters,* is distinguishable from this case based on the plain language of the arbitral clause. In *Mediterranean Enters.,* the joint venture agreement between the parties called for binding arbitration of "any disputes arising hereunder," *see Mediterranean Enters.,* 708 F.2d at 1461, whereas the '005 P & I policies in effect between the parties during 1991–92 mandate arbitration of "any difference or dispute ... *concerning any claim* under the Policy." (*See* 1991 (SD 350) at ¶ 51 & 1992 (SD 350) at ¶ 52 (emphasis added).) The modifier "concerning any claim" makes inapplicable the Ninth Circuit's reasoning in *Mediterranean Enters,* that the language committing the parties to arbitration for disputes arising under the agreement itself was not intended to cover "matters or claims independent of the contract or collateral thereto." *Mediterranean Enters.,* 708 F.2d at 1463. It is clear that if the parties here must arbitrate disputes "concerning *any* claim under the Policy," those claims are not restricted to the "interpretation of the

contract and matters of performance" alone, (see id.) but instead, are inclusive of non-contractual claims which implicate the defendants' duties under the P & I policies themselves.[17] *See also Manetti–Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509 (9th Cir.1988) (interpreting a forum selection clause referring the resolution of any controversy "regarding interpretation or fulfillment of the contract" to Italy broadly primarily because of the word "regarding" as a modifier to the controversies arising under the contract).

Second, the '437 P & I policy governed the parties' relationship between May 20, 1992 and May 20, 1996 (see Compl. at ¶ 38; Defs.' Reply at 1), and provided that "any difference between the Company and the Assured arising out of or in connection with the Policy of Insurance" shall be "referred to arbitration in London in accordance with the Arbitration Acts 1950 to 1979[.]"[18] (1993 (SD350) at ¶ 53; 1994 (SD350) at ¶ 53; & 1995 (SD352) at ¶ 53 (Attach to Jones Decl.).) The language "any difference ... arising out of or in *connection with* the Policy" is both facially broader than "concerning" language in the '005 P & I policy and construed by this Circuit as warranting a broad interpretation. *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir.1999) (holding that even plaintiffs' non-contractual claims, such as their statutory antitrust and copyright claims as well as tort claims for defamation and misappropriation were subject to arbitration because of the language of the parties' non-disclosure agreement which referred to arbitration claims

"in connection with" the contract at issue); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 479 (9th Cir.1991). Plaintiffs' reliance on *Washburn v. Societe Commerciale de Reassurance*, 831 F.2d 149 (7th Cir.1987) for a narrow construction of this language is misplaced. In *Washburn*, the language of the reinsurance contract at issue expressly restricted the parties' arbitration to disputes "with respect to the *interpretation* of this Agreement or the *performance* of the respective obligations of the parties under this Agreement." *Id.* at 150 (emphasis added). This is precisely the language that the Ninth Circuit in *Mediterranean Enters.* construed narrowly because it evidenced the parties' intent to limit arbitration to specific issues that could arise out of the Agreement—disputes as to the interpretation of its terms or as to the parties' performance. *See Mediterranean Enters.*, 708 F.2d at 1463. Here, differences "arising out of or in connection with the Policy" does not evidence an intent to limit arbitration to specific issues—such as interpretive or performance-related disputes regarding the parties' policies. Nor does this language undermine the defendants' assertion that it encompasses collateral disputes—such as tort claims—"arising out of" or "in connection with" the parties' business relationship created by the P & I policies.

Having determined that the language of the '005 P & I policy in effect between the parties during 1991–92 is not narrowly restricted to issues of contractual interpretation or performance, and that language of

---

**17.** Moreover, under recent developments of the law that post-date the decision in *Mediterranean*, the burden is on the party opposing arbitration to rebut the presumption of arbitrability created by the existence of an arbitration agreement by showing a *purpose* to exclude particular disputes from arbitration. *See Teamsters Local 315 v. Union Oil Co. of Cal.*, 856 F.2d 1307, 1314 (9th Cir.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989); *Mitsubishi Motors Corp.*, 473 U.S. at 631, 105 S.Ct. 3346.

**18.** The 1994 and the 1995 policies added the italicized language as follows: "[A]ny difference *or dispute* between the Company and *either* the Assured or *any other Person* arising out of or in connection with the Policy of Insurance shall be referred to arbitration in London." (1994 (SD 350), "Disputes and Differences," at ¶ 53 & 1995 (SD 352), "Disputes and Differences" at ¶ 53, Attach. to Jones Decl.) However, since the parties do not contest the enforceability of the arbitral clauses with respect to their application to third parties, the Court does not discuss this distinction.

the '437 P & I Policy in effect between the parties during 1993–95 is even broader, the Court turns to plaintiffs' five causes of action to determine whether each falls under this language. *See AT & T Tech.*, 475 U.S. at 649–50, 106 S.Ct. 1415 (instructing courts to decide each claim's arbitrability within the scope of the arbitral language before referring the claim(s) to arbitration).

### (c) The Five Causes Of Action Alleged By Plaintiffs In Their Complaint Implicate The Interpretation Of The P & I Policies To Determine The Parties' Specific Duties And Rights And The Performance Thereof

Plaintiffs allege five causes of action in their complaint—the first cause of action for breach of the implied covenant of good faith and fair dealing arising out of defendants' failure to provide the assureds with a defense against claims by the fisherman claimants, (*see* Compl. at 56–60); the second cause of action for breach of the implied covenant of good faith and fair dealing for defendants' failure to discharge their duties as insurers in processing their claims under the policies of insurance, (*see id.* at 62–66); the third cause of action for unfair business practices for defendants' refusal to settle the claims by the fisherman claimants in a timely manner and their misrepresentation regarding "facts and insurance policy provisions," (*see id.* at 68–79); the fourth cause of action for intentional interference with contractual relations for defendants' interference with plaintiffs' contracts with third party lenders and the United States government, (*see id.* at 81–88); and declaratory relief regarding the defendants' obligations to inform plaintiffs of the coverage provided by their policies, (*see id.* at ¶¶ 90–92). Each of this claims either specifically references the interpretation of the P & I policies, (*see id.* at 32 ¶ 5) (requesting the following relief: "As to the Fifth Cause of Action, for a declaration of the rights and responsibilities the parties herein with respect to the policies of marine insurance at issue.") or implicitly charges that defendants' have not performed their obligations in light of the coverage provided to plaintiffs in the P & I policies, (*see id.* at ¶¶ 56 ("*Implied into each policy of insurance* issued by defendants herein to plaintiffs herein is a covenant of good faith and fair dealing which obligated, and continues to obligate, defendants to conduct themselves with respect to the claims asserted by *third parties covered by said policies* [.]"); *id.* at ¶ 62 (alleging that defendants must "conduct themselves . . . in a manner which does not deprive plaintiffs of the *benefit of their bargain*, for which plaintiffs paid substantial premiums."); id. at 73 ("[D]efendants intentionally delayed resolution of the personal injury claims . . . to provide defendants with a means of avoiding altogether their *duty to provide indemnification*."); id. at 85 ("Defendants have also intentionally refused . . . to provide information . . . regarding plaintiffs' right to demand indemnity from defendants, *based on the language of the 'pay to be paid clause' contained in each policy of marine insurance* issued by defendants to plaintiffs herein.") (emphases added).)

The Court can think of no broader allegations which would more obviously implicate an interpretation of the P & I policies in effect between the parties such that plaintiffs' basic allegations of defendants' deficient performance may be resolved. Indeed, there is no support for plaintiffs' conclusion that " 'even if every word of the [P & I policies] were interpreted, this case would be no closer to a resolution.' " (Pls.' Opp'n (quoting *Washburn*, 831 F.2d at 151)), since that is precisely what would be necessary for any resolution of the plaintiffs' claims. *See Manetti–Farrow*, 858 F.2d at 514 (holding that unfair trade practice claim falls within the scope of forum selection clause because it related to the central conflict over the parties' interpretation of the contract). As the Second Circuit has stated, even with respect to a less encompassing arbitration clause, "[i]f the allegations underlying the claims

'touch matters' covered by the [contract at issue] then those matters must be arbitrated, whatever the legal labels attached to them." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 846 (2d Cir.1987) (citations omitted). Certainly, these causes of action fall within the language "concerning any claims under the Policy of Insurance" insofar as they relate to plaintiffs' "claims" for performance and indemnity and to third party claimants covered by the '005 P & I policy in effect during 1991–92. Likewise, the causes of action also fall within the scope of the language of the '437 P & I policy regarding "any difference between the Company and the Assured arising out of or in connection with the Policy of Insurance" to the extent that all the allegations implicate the duties and obligations of the parties under the policies. Even the Court in *Mediterranean,* the case on which plaintiffs rely most heavily to oppose arbitration of this dispute, sent the breach of contract and breach of fiduciary duty claims to arbitration *precisely because* these claims implicated *duties* between the parties created by the contract or the distribution agreement itself. *See* 708 F.2d at 1463; *see also Bennett v. Liberty Nat'l Fire Ins. Co.,* 968 F.2d 969 (9th Cir.1992) (holding that because the dispute between reinsures and insurance liquidator required an examination and interpretation of the relevant contract, it should be referred to arbitration under arbitral clause calling for arbitration of any differences with respect to interpretation of the contract).

■ At the hearing on April 24, 2000, the plaintiffs argued that the specific conduct by defendants that constitutes the factual basis for their five causes of action has only peripheral relation to the actual terms of the P & I policies. For example, plaintiffs argued that even though the parties dispute what actions by plaintiffs would satisfy one of the terms in the P & I policies called the "pay-to-be-paid" clause, it is defendants' failure to respond to plaintiffs' queries regarding that term which gives rise to their complaint for tortious interference and unfair trade practices. However, the Court does not agree with plaintiffs' conclusion that this adequately divorces their causes of action from the P & I policies. The defendants' failure to respond to plaintiffs' inquiries as to what satisfies the "pay-to-be-paid" clause is essentially the defendants' refusal to interpret the P & I policies *for* the plaintiffs and to be bound by that informal interpretation. Thus, the allegations in plaintiffs' complaint "touch upon" matters covered by the P & I policies, especially in light of the Court's finding that the scope of the arbitration clause is not restricted to disputes as to interpretation of or performance under the P & I policies.[19] Finally, the Court's conclusion is consistent with the Supreme Court's pronouncement that a contractual dispute is arbitrable unless it can be said " 'with positive assurance' that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *ML Park,* 71 Wash.App. at 739, 862 P.2d 602 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).[20]

**19.** Plaintiffs also argued that the remedies they request are independent of the contract between the parties, making their claims separate from the contract. However, whether the *remedies* sought by plaintiffs are explicitly allowed in the P & I policies is not a credible test of whether their *claims* and *injuries* arise from those policies.

**20.** Even the fact that both parties' experts agree that the same result would obtain under English law, (*see generally* Stuart Decl.; Gilman Decl. & Supp. Gilman Decl.), only reinforces the Court's conclusion in light of Congress's goal of unifying the standards by which arbitration agreements are enforced in adopting the Convention. *See Scherk,* 417 U.S. at 519, 94 S.Ct. 2449. In this regard, the Court notes that plaintiffs' oral objections to Mr. Gilman's declarations—specifically ¶¶ 23–25 of the First Gilman Declaration, filed on January 12, 2000–at the hearing on April 24, 2000 are moot. In those paragraphs, Mr. Gilman provides his expert opinion as to how an English Court would interpret the scope of the arbitral clauses with respect to plaintiffs'

*(d) Plaintiffs' General Arguments In Opposition To The Construction Of The Scope Of The Arbitral Clauses As Encompassing The Present Dispute Are Inappropriate And Undermine Their Position With Respect To Issues Of Arbitrability*

Plaintiffs argue that as evidenced by the defendants' negative response to the notices of arbitration filed by plaintiffs in 1999 with respect to separate claims between the parties, the defendants have no intention to arbitrate. (*See* Pls.' Opp'n at 11.) Therefore, pointing out that the defendants are likely to convince the arbitral panel to postpone negotiation pending a "mythical" final judicial resolution of the fisherman claimants' suits, plaintiffs argue that this Court should not compel arbitration because plaintiffs' will be left without a remedy. Preliminarily, defendants vigorously dispute the plaintiffs' characterization of their response as a delaying tactic, point to the successful resolution of various disputes between the parties as evidence of their intent to arbitrate in good faith, and note that the parties' have equivalent control, or lack thereof, in persuading the arbitral panel of their positions. (*See* Defs.' Reply at 8.) However, the Court need not reach the issue of whether arbitration would be fair, effective, economical, or equitable, for it is specifically directed not to look at the underlying merits of the parties' dispute in deciding whether the parties agreed to arbitrate a particular dispute. *See AT & T Tech.*, 475 U.S. at 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[A] court should not determine the underlying merits of a dispute in determining the arbitrability of an issue."); *accord Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 530, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995); *see also Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C.Cir.1997) (implicitly rejecting any arguments that arbitration may not be as effective as litigation noting and approving

the prevailing view of many courts that arbitration is not necessarily inferior to litigation as a mechanism for the resolution of employment disputes) (citations omitted). In other words, whether plaintiffs' were unlikely to prevail because of the bias of the arbitration panel or whether defendants' have an unfair advantage on the merits in front of the arbitral panel is irrelevant to the Court's inquiry, and constitutes a proper objection only when, and if, the Court is asked to enforce the arbitral award. Moreover, plaintiffs' reference to ongoing arbitration between the parties of certain disputes arising out of claims related to the present complaint undermine plaintiffs' position as to the arbitrability of the present dispute, and may well estop them from undermining the enforceability of the arbitral clauses at issue as a factual matter.

Accordingly, the Court concludes the first stage of its inquiry by answering all four preliminary questions in the affirmative and finds the existence of an "agreement in writing" to arbitrate the "subject of the dispute" in London between two parties of different signatory countries to the Convention with a contractual commercial relationship arising out of maritime insurance policies.

### 2. The Second Stage of the Inquiry— The Enforceability Of the Arbitral Clauses

■ In support of their argument that the arbitration clauses are unenforceable, plaintiffs rely on California contract law to argue that the clauses are unconscionable because they result from (1) oppression or (2) surprise. (*See* Pls.' Opp'n at 16 (citing *Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 1532, 60 Cal.Rptr.2d 138 (1997).)) However, it is well-established that it is not state law, but internationally recognized defenses to contract formation or public policy concerns of the forum nation, which makes a valid agreement to arbi-

causes of action. Since the Court has not based its decision on these portions of Mr.

Gilman's declarations, these objections are clearly moot.

trate the subject of the dispute unenforceable under Article II, section 3 of the Convention. *See* Art. II § 3 ("The court of a Contracting State . . . shall . . . refer the parties to arbitration, unless it finds that the [ ] agreement in null and void, inoperative or incapable of being performed."); *Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V.,* 609 F.Supp. 75 (S.D.N.Y.1985) (holding that Under Article II, § 3, an agreement to arbitrate is "null and void" only when it is subject to internationally recognized defenses such as duress, mistake, fraud, or waiver, or when it contravenes fundamental policies of the forum nation); *see also Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953 (10th Cir.), *cert. denied* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992) (noting that the "null and void" exclusion in the Convention is to be narrowly construed and holding that agreement between British underwriters and American agent to arbitrate any dispute was not null and void since agent never pleaded that specific choice provisions at issue were obtained by fraud or coercion and the agent's claim of fraud in the inducement of the contract could be resolved by arbitral panel itself).

 At the hearing on April 24, 2000, plaintiffs noted the California legislature's codification of a policy to scrutinize arbitration agreements by unadmitted insurance companies stringently because of the concern that its citizens would be forced to arbitrate their disputes in foreign countries. Plaintiffs then relied on this policy to argue that the Court should not find the arbitral clauses enforceable under the "null and void" clause of Article II section 3 of the Convention. However, this argument is deficient in four key regards. First, there is little concern that plaintiffs will be unfairly or unexpectedly dragged to London to arbitrate their disputes since plaintiffs renounced the marine insurance market in the United States in favor of hiring skilled brokers in London to procure an international marine insurance contract with defendants, who are English

insurance companies. Nothing in this transaction resembles the scenario most likely envisioned by the California legislature, where insurance companies solicit local citizens and unexpectedly include a foreign arbitration provision in the parties' standard form contract. Second, plaintiffs disregard the fact that the degree of their sophistication and bargaining power is more than apparent, as evidenced by their ability to negotiate changes in standard form P & I policies by institutional English insurance entities such as defendants. Third, plaintiffs' argument that state or local policy should even be considered, let alone be given supremacy, is completely at odds with the entire tenor of their argument to date that the Convention is the supreme law of the land, and that where the Convention applies, it does so exclusively. Since the Court agrees that the Convention applies exclusively, it finds plaintiffs' present reliance on California policy unpersuasive. Finally, the First Circuit has rejected precisely the arguments that plaintiffs' make to undermine the enforceability of the arbitral clauses at issue here:

> The parochial interests of the Commonwealth [of Puerto Rico], or of any state, cannot be the measure of how the "null and void" clause is interpreted. Indeed, by acceding to and implementing the treaty, the federal government has insisted that not even the parochial interests of the nation may be the measure of interpretation. Rather, the clause must be interpreted to encompass only those situations-such as fraud, mistake, duress, and waiver-that can be applied neutrally on an international scale.

*Ledee,* 684 F.2d at 187 (citation omitted); *I.T.A.D. Assoc., Inc. v. Podar Bros.,* 636 F.2d 75 (4th Cir.1981) (holding that under the backdrop of defenses applied internationally, "Article II(3) [of the Convention] contemplates the possibility of waiver of the arbitration agreement by the one or both of the parties, but [ ] the facts of this

case do not demonstrate such a waiver.").[21] Moreover, neither courts in California nor federal courts have found arbitration agreements in P & I insurance polices *per se* unconscionable; instead, both have consistently enforced them. *See, e.g., California Grocers Ass'n. Inc. v. Bank of Am.*, 22 Cal.App.4th 205, 215, 27 Cal.Rptr.2d 396 (1994) (holding that to be unconscionable, the arbitration agreement must "shock the conscience" of the court); *Thomas v. Perry*, 200 Cal.App.3d 510, 514–16, 246 Cal. Rptr. 156 (1988) (holding that *under the FAA,* an arbitration agreement is not unconscionable without a showing that the terms, procedure, or circumstances surrounding the implementation of the agreement are unjust).[22]

Plaintiffs' also erroneously attempt to undermine defendants' argument that state law contract principles cannot bar arbitration of disputes subject to the FAA by factually distinguishing cases cited by the defendants. For example, plaintiffs state that because of the strong policy concerns of the Securities and Exchange Commission with regard to claims arising out of securities fraud and stock disputes in *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282 (9th Cir.1988), this Court should not apply the Ninth Circuit's conclusion that state law does not bar arbitration arising under the FAA. However, Congress's plenary power in enforcing treaties pursuant to its constitutional mandate, *see* U.S. Const. art. VI cl. 2, is hardly less controlling than any policy pronouncements by the Commissioner of the SEC regarding the SEC's plenary power over arbitration procedures adopted by securities association. Even the well-settled federal policy favoring arbitration discussed above and the variety of statutory, tort, and contract claims subject to arbitration persuades the Court that plaintiffs' argument lacks merit. *See, e.g., Haviland v. Goldman, Sachs & Co.*, 947 F.2d 601 (2d Cir.1991) (enforcing agreement to arbitrate RICO claim); *Bird v. Shearson Lehman/American Express, Inc.*, 926 F.2d 116 (2d Cir.1991) (ERISA violation claim); *Alexander Binzel Corp. v. Nu–Tecsys Corp.*, No. 91 Civ. 2092, 1992 WL 26932 (N.D.Ill. Feb. 11, 1992) (federal trademark claim); *Scott v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 89 Civ. 3749(MTL), 1992 WL 245506 (S.D.N.Y. Sept. 14, 1992) (Title VII and 42 U.S.C. § 1981 claims); *Edelman v. Marek*, No. 91 Civ. 6889(TPG), 1992 WL 321715 (S.D.N.Y. Oct. 23, 1992) (malpractice and breach of fiduciary duty

**21.** This conclusion accords with the general mode by which appellate courts have construed the Convention and Chapter Two of the Federal Arbitration Act. *See Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973–74 (2d Cir.1974) (construing narrowly the "public policy" defense to enforcement of awards under Article V(2)(b)); *McCreary Tire & Rubber Co. v. CEAT, S.P.A.*, 501 F.2d 1032 (3d Cir.1974) (observing that there is "nothing discretionary" about Article II(3)). Similar considerations have influenced the construction of other domestic statutes in the context of international arbitration. *See Scherk*, 417 U.S. at 516–17, 94 S.Ct. 2449 ("A parochial refusal by the courts of one country to enforce an international arbitration agreement [on forum non conveniens grounds] would not only frustrate the[ ] purposes [of the Convention and its implementation by Congress], but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advan-

tages"); *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. and Sys. Co.*, 643 F.2d 863, 867 (1st Cir.1981). Even if plaintiffs were to claim that they were induced by fraud to negotiate the P & I policies, that claim would be arbitrable. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096, 1103 (2d Cir.1987).

**22.** Notwithstanding that plaintiffs' conclusory arguments have failed to create any doubts as to the enforceability of the arbitration clause at issue, the Court notes that even if plaintiffs sufficiently raised those doubts, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or *a like defense to arbitrability.*" *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1440 (9th Cir.1994) (emphasis added).

claims); *Springfield Terminal Ry. Co. v. United Transp. Union,* 767 F.Supp. 333 (D.Me.1991) (claim arising under Federal Railroad Safety Act); *Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698, 700 (11th Cir.1992) (sexual harassment claims).

Therefore, plaintiffs' fail to show that the arbitral clause, or the agreement in which it is contained, is "null and void, inoperative or incapable of being performed" under Article II, section 3 of the Convention.[23] Accordingly, the Court **GRANTS** defendants' motion to compel arbitration in accordance with the provisions of the parties' agreement.

## II. DEFENDANTS' MOTION TO STAY ACTION PENDING ARBITRATION

Some courts have suggested that the language of Article II section 3 of the Convention. which states that a court "shall refer the parties to arbitration" once the requirements of the Convention have been satisfied means, by negative implication, that a stay is not permitted. *See McCreary Tire & Rubber Co.,* 501 F.2d at 1037 (holding that the proper remedy in a Convention case is to refer the parties to arbitration and dismiss for lack of subject matter jurisdiction); *Siderius, Inc. v. Compania de Acero del Pacifico, S.A.,* 453 F.Supp. 22, 25 (S.D.N.Y.1978) (dismissal required). However, other courts have noted that such a proposition is "facially absurd" because the enabling legislation gives the district court the power at least to compel arbitration, which could not be exercised without subject matter jurisdiction. *See Filanto,* 789 F.Supp. at 1241–42 (agreeing in theory that stay is available in cases under the Convention but rejecting defendants' motion for a stay because of the facts of the case); *Rhone Mediterranee Compagnia Francese,* 712 F.2d at 54 (holding that granting a stay pending arbitration is permissible in Convention cases); *Borden, Inc. v. Meiji Milk Products Co., Ltd.,* 919 F.2d 822, 826 (2d Cir.1990) (allowing an injunction in aid of arbitration in a Convention case), *cert. denied,* 500 U.S. 953, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991).

Here, finding the latter proposition more persuasive and in the absence of any objection to a stay by plaintiffs, the Court exercises its discretion and GRANTS defendants' motion to stay the action pending arbitration.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the defendants' motion to compel arbitration in London in accordance with the terms of the parties' arbitral clause.[24] Additionally, the Court **ORDERS** that one of the parties initiate arbitration of the present dispute by no later than sixty (60) days from the date on

---

**23.** In light of the Court's conclusion, it does not address the defendants' cumulative estoppel argument, based on the analogy to non-signatories to a contract who are estopped from denying the arbitrability of their disputes when they have received benefits from the contract in which the arbitral clause is contained. (*See* Defs.' Supp. Reply at 7 (citations omitted).)

**24.** *See* 9 U.S.C. § 206 ("A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."). Although plaintiffs assert that if the Court decides to compel arbitration, the "only appropriate place to conduct

arbitration would be California," they rely on the public policy of the state of California, which the Court has already found inapposite in arbitration agreements arising under the Convention. Also, plaintiffs erroneously rely on a provision in the Convention which relates to "arbitral awards" not "arbitration agreement" and which implicates national public policy, not local or state. *See* Art. V § 2(b) ("Recognition and enforcement of an arbitral *award* may also be refused if competent authority in the country where recognition and enforcement is sought finds that ... [t]he recognition or enforcement of the *award* would be contrary to the public policy of that *country.*") (emphases added) (cited in Pls.' Resp. to Ct.'s Ord. at 9, n. 7).

which this Order is stamped "Filed." [25] Finally, the Court **GRANTS** defendants' motion to stay the action and **ORDERS** that this action be stayed in its entirety pending arbitration, subject to its re-opening by the parties at the conclusion of arbitration.

**IT IS SO ORDERED.**

25. The Court notes the defendants' representation at the hearing on April 24, 2000 that they harbor no bad faith intent to avoid arbitration, and the parties' consensus that the Court may set a reasonable date for the initiation of arbitration.