The district court correctly declined to disregard PEC's corporate form, finding

---

tion's recovery under the fidelity bond. Indeed, to the extent the holding in *Gordon* was based on this principle we concur with the court's reasoning.

6. To the extent the Trustee is contending that the right of PEC's creditors to recover under the LEU policies should be analyzed independently from PEC's right to recover, we disagree. A trustee may bring only those claims that a debtor could have brought prior to entering bankruptcy. *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir.1995).

that the Felzenbergs were not alter egos of PEC. This finding was not inconsistent with holding PEC responsible for material misrepresentations made by Robert Felzenberg on the LEU application. Robert Felzenberg acted on behalf of PEC as the corporation's agent in procuring the LEU policies. Under New Jersey law the corporate principal is responsible for the consequences of its agent's material misrepresentations on an insurance application, even when the principal could have no knowledge of the agent's deceptions. Neither the adverse domination theory nor the adverse interest exception serve to negate the consequences for PEC of Robert Felzenberg's misrepresentations. Accordingly, the LEU policies were void *ab initio.* The judgment of the district court is AFFIRMED.

**KAHN LUCAS LANCASTER, INC., Plaintiff–Appellee,**

v.

**LARK INTERNATIONAL LTD., Defendant–Appellant.**

No. 97–9436.

United States Court of Appeals, Second Circuit.

Argued June 12, 1998.

Decided July 29, 1999.

---

Robert K. Gross, New York, NY (Robert D. Popper, Eaton & Van Winkle, New York, NY, on the brief), for. Defendant–Appellant.

Andrew J. Goodman, New York, NY (Joseph P. Tucker, Rosner Bresler Goodman & Utterman, LLP, New York, NY, of counsel), for Plaintiff–Appellee.

Before: WALKER, McLAUGHLIN and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Defendant–Appellant Lark International, Ltd., ("Lark") appeals from a judgment of the United States District Court for the Southern District of New York (Denise L. Cote, Judge), entered August 15, 1997, granting Plaintiff–Appellee Kahn Lucas Lancaster, Inc.'s ("Kahn Lucas") motion under 9 U.S.C. § 206 and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Jun. 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (entered into force with respect to the United States, Dec. 29, 1970) (the "New York Convention" or the "Convention"), as implemented, 9 U.S.C. §§ 201–08, to compel arbitration. The judgment was entered in accordance with an Opinion and Order of the district court, dated August 6, 1997, which held that arbitration clauses in certain purchase orders sent by Kahn Lucas to Lark were enforceable under the Convention and bound Lark, despite the fact that Lark had not signed the purchase orders.

We reverse.

## I. BACKGROUND

### A. *Facts*

Lark is a Hong Kong corporation which acts as a purchasing agent for businesses seeking to buy and import clothing manufactured in Asia. Kahn Lucas is a New York corporation, with its principal place of business in New York, NY, engaged in the children's clothing business, primarily

in reselling imported clothing to major retailers.

Kahn Lucas and Lark enjoyed a business relationship which began in 1988 and pursuant to which Lark would assist Kahn Lucas in arranging for overseas manufacturers to make garments ordered by Kahn Lucas. As part of this relationship, Lark processed Kahn Lucas's purchase orders and invoices. Pursuant to the terms of the purchase orders, as well as the parties' standing practice, the manufacturers would issue Kahn Lucas a seller's invoice for payment once the ordered garments were completed. Lark would then issue a separate invoice to Kahn Lucas for its commission, usually a set percentage of the amount charged by the manufacturer, on the order. Kahn Lucas paid both of these invoices through draw-downs on an existing letter of credit on which Lark was the named beneficiary. Lark would then remit payment to the manufacturer.

The dispute in this case arises from two purchase orders Kahn Lucas issued in early 1995 for children's fleece garments, manufactured in the Philippines, that it was to resell to Sears Roebuck, Inc. (the "Purchase Orders"). The Purchase Orders stated that the garments were "ordered from" Lark, listed "Lark International (Agent)" as seller, and were signed by Kahn Lucas. They were not signed by Lark. The Purchase Orders also clearly indicated that they contained a number of additional terms printed on the reverse side, and were made conditional upon the seller's acceptance of those terms. Included in these terms were clauses relating to arbitration, which stated:

> Any controversy arising out of or relating to this Order ... shall be resolved by arbitration in the City of New York.... The parties consent to application of the New York or Federal Arbitration Statutes and to the jurisdiction of the Supreme Court of the State of New York, and of the United States District Court for the Southern District

of New York, for all purposes in connection with said arbitration....

(the "Arbitration Clauses"). Lark accepted the Purchase Orders without objection.

In July 1995, the manufacturers issued final invoices relating to the ordered garments, and Lark issued its commission invoice. But citing defective garments and failed deliveries, Kahn Lucas refused to release funds to Lark to pay either the seller's invoices or Lark's commission invoice.

### B. *Proceedings Below*

Unable to achieve a satisfactory settlement with Lark and the manufacturers, Kahn Lucas sued Lark in the United States District Court for the Southern District of New York, invoking diversity jurisdiction and alleging breach of contract, breach of warranty, negligence, and breach of fiduciary duty. Lark responded to the complaint with a motion to dismiss for lack of personal jurisdiction. Kahn Lucas responded by asserting numerous bases upon which to premise personal jurisdiction, including transient jurisdiction (as one of Lark's officers had been served while in New York) and the New York long arm statute, N.Y. C.P.L.R. § 302(a)(1). In an Opinion and Order dated February 24, 1997, the district court held that it did not have personal jurisdiction over Lark to adjudicate the then-pending claims, but also held that, given the Arbitration Clauses, it would have personal jurisdiction over Lark if Kahn Lucas were to seek to compel arbitration. *See Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 956 F.Supp. 1131, 1139 (S.D.N.Y. 1997) (*"Kahn Lucas I "*). Accordingly, the district court conditionally dismissed Kahn Lucas's claims, but stayed the dismissal to afford Kahn Lucas the opportunity to bring a motion to compel arbitration.

By motion brought pursuant to 9 U.S.C. § 206 and the Convention, Kahn Lucas converted its complaint into a motion to compel Lark to arbitrate the dispute in accordance with the Arbitration Clauses.

Kahn Lucas also filed a demand for arbitration with the American Arbitration Association. Lark opposed the motion to compel arbitration. Lark argued that it was not bound by the provisions of the Purchase Orders because the Purchase Orders were directed towards the sellers of the garments to which they related, namely the manufacturers, and not towards Lark. Lark also argued that the Arbitration Clauses were not enforceable under the Convention because Lark had not signed the Purchase Orders.

In an Opinion and Order dated August 6, 1997, the district court granted Kahn Lucas's motion to compel arbitration. *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, No. 95 CIV. 10506, 1997 WL 458785 at *8 (S.D.N.Y. Aug.11, 1997) ("*Kahn Lucas II*"). The district court first noted that subject matter jurisdiction could only be properly based on section 203 of the implementing statutes of the Convention, 9 U.S.C. § 203, which provides an independent basis for subject matter jurisdiction; it could not be based on diversity. *Id.* at *3 (citing *Matimak Trading Co. v. Khalily*, 118 F.3d 76 (2d Cir.1997) (holding that Hong Kong corporations are not citizens of a foreign state for purposes of diversity jurisdiction)). Section 203 states that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203.

The court next focused on whether the Arbitration Clauses were enforceable under the Convention so as to vest the court with jurisdiction under section 203. The Convention provides that "[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them ... concerning a subject matter capable of settlement by arbitration." New York Convention art. II, § 1. The Convention goes on to define "agreement in writing" to include "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." New York Convention art. II, § 2. Although Lark had not signed the Purchase Orders, the district court held that the Purchase Orders represented an "arbitral clause in a contract," and therefore an "agreement in writing" to arbitrate sufficient to bring the dispute within the Convention. In holding that an arbitral clause in a contract need not be signed by the parties to be enforceable under the Convention, the district court relied on the only appellate case interpreting this section of the Convention, *Sphere Drake Ins. PLC v. Marine Towing, Inc.*, 16 F.3d 666, 669 (5th Cir.1994) (outlining, without much analysis, article II, section 1 of the Convention as including "(1) an arbitral clause in a contract or (2) an arbitration agreement, (a) signed by the parties or (b) contained in an exchange of letters or telegrams"), and declined to follow *Sen Mar, Inc. v. Tiger Petroleum Corp.*, 774 F.Supp. 879, 882 (S.D.N.Y.1991) ("An arbitration clause is enforceable only if it is found in a signed writing or an exchange of letters.").

The district court then turned to Lark's argument that it should not be bound by the Arbitration Clauses because it was not the seller of the garments. The district court held that the Purchase Orders embodied "an agreement between Kahn Lucas and Lark for the sale of goods, as opposed to an agreement between Kahn Lucas and the manufacturers." *Kahn Lucas II*, 1997 WL 458785 at *5. The district court relied on the fact that Kahn Lucas and Lark were the only parties mentioned on the Purchase Orders, and on the fact that Kahn Lucas was to pay Lark directly for the garments ultimately delivered under the Purchase Orders. *See id.* Finally, the district court found that Lark was bound to the terms of the Purchase Orders despite the fact it did not sign them because it manifested assent to the Purchase Orders by performing under them, and that the subject of the dispute was there-

fore within the scope of the Arbitration Clauses. *See id.* at *6.

Lark then moved pursuant to Fed. R.Civ.P. 59 to alter or amend the district court's judgment, but the district court promptly denied this motion. Lark timely appealed.

## II. ANALYSIS

On appeal, Lark advances largely the same arguments that it did below. First, it argues that in order to be enforceable under the terms of the Convention, any agreement to arbitrate, be it an "arbitral clause in a contract" or an "arbitration agreement," must be signed by the parties or contained in an exchange of letters or telegrams. Because the Purchase Orders were not signed by both parties, the argument continues, they are not "agreements in writing" enforceable under the Convention. Second, Lark argues that the district court erred in finding that it was bound by the terms of the Purchase Orders, including the Arbitration Clauses, because it was not the seller of the garments.

For the reasons that follow, we hold that the definition of "agreement in writing" in the Convention requires that such an agreement, whether it be an arbitration agreement or an arbitral clause in a contract, be signed by the parties or contained in a series of letters or telegrams. Therefore, the Arbitration Clauses are not enforceable under the Convention, and both the district court and this Court lack subject matter jurisdiction over the dispute. Because of this holding, we need not consider Lark's second argument, and we accordingly reverse the judgment of the district court and dismiss Kahn Lucas's motion to compel arbitration for lack of subject matter jurisdiction.

### A. *Applicable Principles of Construction*

Treaties are construed in much the same manner as statutes. *See United States v. Alvarez–Machain,* 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441

(1992); *see also Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 177–83, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). The district court's construction of the Convention, like the construction of any statute, is a matter of law which we review *de novo. See Stuart v. United States,* 813 F.2d 243, 246 (9th Cir.1987), *rev'd on other grounds,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989); *see also Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.,* 961 F.2d 341, 347–48 (2d Cir.1992). Statutory construction is a "holistic endeavor" and must account for the statute's "full text, language as well as punctuation, structure and subject matter." *United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (internal quotations omitted). Thus, the obvious starting point in construing a treaty is its text. *See Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). And the plain meaning of a text "will typically heed the commands of its punctuation." *United States Nat'l Bank,* 508 U.S at 454, 113 S.Ct. 2173; *see also United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (holding that the "grammatical structure of the statute," specifically the placement of commas, mandated a specific construction).

Among the rules of punctuation applied in construing statutes is this: When a modifier is set off from a series of antecedents by a comma, the modifier should be read to apply to each of those antecedents. *See Bingham, Ltd. v. United States,* 724 F.2d 921, 925–26 n. 3 (11th Cir.1984); *see also Elliot Coal Mining Co. v. Director, Office of Workers' Comp. Programs,* 17 F.3d 616, 630 (3d Cir.1994) (noting that the "use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase"). As stated by the Eleventh Circuit, this rule is a "supplementary 'rule of

punctuation,' " to the "doctrine of the last antecedent," which states that a modifier generally applies only to the nearest, or last, antecedent.[1] *See Bingham,* 724 F.2d at 925–26 n. 3 (citing *Quindlen v. Prudential Ins. Co. of Am.,* 482 F.2d 876, 878 (5th Cir.1973)). Of course, "these doctrines are not absolute rules," *id.* at 926 n. 3, and in applying them we are mindful of the Supreme Court's admonition that "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *United States Nat'l Bank,* 508 U.S. at 454, 113 S.Ct. 2173.

■ In addition to utilizing rules of punctuation, we are aided in our plain-meaning analysis by the fact that the Convention exists in five official languages—French, Spanish, English, Chinese, and Russian—of equal authenticity. *See* New York Convention art. XVI, § 1. Because one purpose of the Convention is to unify the standards under which international agreements to arbitrate are observed, *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), we should, if possible, adhere to an interpretation consistent with all of the official languages. That said, some of the official languages provide more insight into the drafters' intent than others: Of the five official languages, English, French, and Spanish were the working languages of the United Nations Conference on International Commercial Arbitration, which drafted the Convention. *See Rules of Procedure,* U.N. Conference on Int'l Commercial Arbitration, Rule 32, E/Conf.26/5/Rev.1 (1958)(hereinafter *"Rules of Procedure"*); *see also Eastern Airlines,* 499 U.S. at 536, 111 S.Ct. 1489 (considering language employed by drafters to gain insight into intent of parties). All records of Conference meetings were kept in these working languages. *Rules of Procedure* at Rule 36.

■ Finally, to the extent the drafters' intent is unclear from the text of the multiple versions of the Convention, we may turn to the Convention's legislative history for guidance. *Eastern Airlines,* 499 U.S. at 535, 111 S.Ct. 1489 (treaty history and negotiations may be consulted in construing difficult or ambiguous treaty passages).

## B. *Construction of the New York Convention*

As noted above, article II, section 1 of the Convention provides that each contracting state (including the United States, China, the United Kingdom, and Hong Kong) "shall recognize" an "agreement in writing" to arbitrate a given dispute. Article II, section 2, in turn, defines the term "agreement in writing" to include "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Lark contends that the modifying clause "signed by the parties or contained in an exchange of letters or telegrams," modifies both: (1) "an arbitral clause in a contract" and (2) "an arbitration agreement" and, as a result, the dispute between the parties is not arbitrable due to the absence of Lark's signature on the Purchase Orders. Kahn Lucas contends, and the district court held, that "signed by the parties" modifies only the clause immediately preceding it, "an arbitration agreement," and not the previous clause. Thus, in Kahn Lucas's view, the unsigned Purchase Orders constitute an "agreement in writing" to arbitrate enforceable under the Convention.

■ As an initial matter, we must determine the meaning of the two elements in the series, namely "an arbitral clause in a

---

1. These rules are illustrated by the following examples. Consider a sentence containing two antecedents—"A" and "B"—and one modifying phrase—"with C." The doctrine of the last antecedent suggests that if the sentence were structured "A or B with C", the phrase "with C" should be read to modify only "B." However, the "supplementary rule" of *Bingham* suggests that if the sentence were structured "A or B, with C", the phrase "with C" should be read to modify both "A" and "B."

contract" and "an arbitration agreement." We find the meaning of "an arbitral clause in a contract" to be self-evident. We also find that the phrase "an arbitration agreement," because it is used in conjunction with the phrase "an arbitral clause in a contract," refers to any agreement to arbitrate which is not a clause in a larger agreement, whether that agreement is part of a larger contractual relationship or is an entirely distinct agreement which relates to a non-contractual dispute. The parties agree that the Arbitration Clauses each constitute "an arbitral clause in a contract" and not "an arbitration agreement" under the Convention.

 We turn, then, to the plain meaning of the English-language version of the Convention. Taking its lead from the Fifth Circuit's analysis in *Sphere Drake*, 16 F.3d at 669–70, Kahn Lucas argues that the grammatical structure of section 2 compels the conclusion that its dispute with Lark falls within the Convention. We disagree. Section 2 takes the structure "A or B, with C." This structure is exactly that to which the "supplementary rule of punctuation" expressed in *Bingham* applies. Grammatically, the comma immediately following "an arbitration agreement" serves to separate the series ("an arbitral clause in a contract or an arbitration agreement") from the modifying phrase ("signed by the parties or contained in an exchange of letters or telegrams"), and suggests that the modifying phrase is meant to apply to both elements in the series. Indeed, this comma can serve no other grammatical purpose. As a result, Kahn Lucas's reading of the statute would render the comma mere surplusage, a construction frowned upon. *Cf. Trichilo v. Secretary of Health & Human Servs.*, 823 F.2d 702, 706 (2d Cir.1987) ("we will not interpret a statute so that some of its terms are rendered a nullity").

 Although the grammatical structure of the English-language version of the Convention suggests that the parties' dispute is not arbitrable, we are hesitant to use punctuation as the sole guide to the meaning of the text. *See United States Nat'l Bank*, 508 U.S. at 454–55, 113 S.Ct. 2173. But in this case, other available interpretive tools strongly support the conclusion the punctuation suggests.

First, the plain language of the other working-language versions of the Convention compels the conclusion that, in order to be enforceable under the Convention, both an arbitral clause in a contract and an arbitration agreement must be signed by the parties or contained in an exchange of letters or telegrams. In the French- and Spanish-language versions, the word for "signed" appears in the plural form, *"signes"* and *"firmados"* respectively. New York Convention, 21 U.S.T. 2524, 2538. Because each of the two antecedents is couched in the singular, the modifier unambiguously applies to both of them. If, as Kahn Lucas argues, only an arbitration agreement need be signed by the parties, the French-language version would utilize the verb *"signe"* and the Spanish *"firmado."*

The non-working official-language versions of the Convention do not offer similarly clear-cut support for this interpretation, but do not weigh strongly against it either. The Chinese-language version, like the English-language version, cannot utilize a uniquely plural form of the verb for "signed." Nor does it contain punctuation helpful to our task. However, in the Chinese-language version, the modifier "signed" precedes, rather than follows, the objects it modifies. New York Convention, 21 U.S.T. 2529. Therefore, if the modifier were construed to apply only to one of the objects, it would apply to "arbitral clause in a contract," rather than "arbitration agreement," offering no comfort to Kahn Lucas in this case. The Russian-language version uses the singular form of the verb "signed" (transliterated as "PODPECANOYE"), suggesting that it modifies only "arbitration agreement." New York Convention, 21 U.S.T. 2533. But because the plain meaning of the

French- and Spanish-language versions of the Convention unambiguously supports the conclusion that the modifier applies to both antecedents, the structure of the English-language version suggests such an interpretation, and the Chinese-language version is susceptible of such an interpretation, we are reluctant to allow the seemingly contradictory Russian-language version to dictate a different result. *See Eastern Airlines,* 499 U.S. at 536, 111 S.Ct. 1489 (giving controlling weight to meaning of language in which treaty was drafted). This is particularly so in light of the stated purposes of the Convention, one of which is to "unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk,* 417 U.S. at 520 n. 15, 94 S.Ct. 2449 (citing the Convention).

Finally, to the extent the plain meanings of the non-English language versions of the Convention do not resolve any ambiguity that exists in the English-language version, the legislative history of article II puts the matter to rest. The text of article II, as reported by the Conference's Working Group, and subject only to modification by the Drafting Committee for form, not substance, *Summary of the 23d Meeting,* U.N. Conference on Int'l Commercial Arbitration, U.N. ESCOR, E/Conf.26/SR.23 at 4, 7 (Sept. 12, 1958), reverses the terms "arbitration agreement" and "arbitration clause in a contract." The Working Group text thus reads: "The expression 'agreement in writing' shall mean an arbitration agreement or an arbitration clause in a contract signed by the parties, or an exchange of letters or telegrams between those parties."[2] *Consideration of the Draft New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* U.N. Conference on Int'l Commercial Arbitration, U.N. ESCOR, E/Conf.26/L.59, Agenda Item 4, ¶ 2 (June

6, 1958). Therefore, unless the modifier "signed" in the Convention applies to both antecedents, the Drafting Committee's editorial changes would amount to an unintended, and unauthorized, substantive amendment to article II, section 2.

■ Accordingly, although we are cognizant that the Convention "should be interpreted broadly to effectuate its recognition and enforcement purposes," *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 933 (2d Cir.1983), the rules governing our construction do not allow us to follow the Fifth Circuit's interpretation of article II, section 2 as expressed in *Sphere Drake.* Upon review of the Convention's text, punctuation and subject matter, as well as an examination of the Convention's legislative history, we hold that the modifying phrase "signed by the parties or contained in an exchange of letters or telegrams" applies to both "an arbitral clause in a contract" and "an arbitration agreement."

## C. Application to the Facts

Having determined that the Convention requires that "an arbitral clause in a contract" be "signed by the parties or contained in an exchange of letters or telegrams," we turn to the application of the Convention to the facts of this case.

■ As noted above, the Arbitration Clauses were contained in the Purchase Orders which were signed only by Kahn Lucas, and not by Lark. There is therefore no "arbitral clause in a contract . . . signed by the parties." Further, Kahn Lucas does not contend that the Purchase Orders, even together with Lark's Confirmation of Order forms, represent "an arbitral clause in a contract . . . contained in an exchange of letters or telegrams." As a result, there is no "agreement in writing" sufficient to bring this dispute within the scope of the Convention.

---

**2.** The fact that the Working Group text does not contain a comma between "arbitral clause in a contract" and "signed by the parties" offers no refuge for Kahn Lucas. Even

when construed according to the doctrine of the last antecedent, the Working Group text requires that an arbitral clause be signed by the parties.

Because the dispute in question does not fall within the Convention, subject matter jurisdiction cannot properly be premised on 9 U.S.C. § 203. The district court and this Court thus lack subject matter jurisdiction over this dispute. The judgment of the district court is reversed, and Kahn Lucas's motion to compel arbitration is dismissed with prejudice.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed, and Kahn Lucas's motion to compel arbitration is dismissed with prejudice for lack of subject matter jurisdiction.