**CZARINA, L.L.C., as assignee of HALVANON INSURANCE CO. LTD., Plaintiff,**

v.

**W.F. POE SYNDICATE, Defendant.**

No. 8:01–cv–1449–T–23TBM.

United States District Court, M.D. Florida, Tampa Division.

Nov. 18, 2002.

**1230**

F. Lorraine Jahn, Solomon & Benedict, P.A., Tampa, FL, Mary Cannon Veed, Jessica Tovrov, Peterson & Ross, Chicago, IL, for Plaintiff.

Alice Ruth Huneycutt, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Tampa, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MERRYDAY, District Judge.

Czarina, L.L.C. (Czarina), as assignee of Halvanon Insurance Co., Ltd. (Halvanon), seeks a judgment confirming a July 10, 2001, arbitration award in favor of Czarina and against W.F. Poe Syndicate (Poe) rendered by an arbitration panel convened in London, England. Czarina proceeds under the "Convention on the Recognition and Enforcement of Foreign Arbitral Awards" (the Convention), to which the United States and the United Kingdom are parties and which is enforceable in the United States through chapter two of the Federal Arbitration Act, 9 U.S.C. § 201, et seq. *See Industrial Risk v. M.A.N. Gutehoffnungshutte*, 141 F.3d 1434, 1440 (11th Cir.1998).[1] A non-jury trial occurred on

---

**1.** The pertinent provisions of the Convention provide:

Article II

Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

The court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agree-

August 26–28, 2002.[2]

### Findings of Fact

Czarina is a Delaware limited liability corporation with its principal place of business in New York. Halvanon was an Israeli insurance company that was placed into liquidation in London in 1985. Poe is a Florida corporation. Pursuant to a deed of assignment dated May 14, 1998, Halvanon's liquidators assigned Halvanon's rights and claims against certain parties to Czarina. In particular, Halvanon's liquidators assigned to Czarina Halvanon's rights and claims to certain accounts receivable owed to Halvanon by Poe. Czarina's efforts to collect the outstanding accounts receivable culminated in the London arbitration award that Czarina now seeks to confirm.

The accounts receivable that Czarina seeks to collect from Poe derive from a 1984 transaction (the 1984 agreement) by which Halvanon secured reinsurance from a number of reinsurers, including Poe.[3] Pursuant to the 1984 agreement (administered on a "net accounting basis") and in exchange for Poe's reinsurance commitment, Poe appreciated only one reinsurance premium payment of approximately $500, which occurred in the first quarter of 1984. Poe received no other payments from the 1984 agreement and, although losses occurred that were subject to rein-

surance resulting from the 1984 agreement, Poe indemnified neither Halvanon nor any other party.

In 1993, Poe received an inquiry from Halvanon's liquidator concerning Poe's liability under the 1984 agreement. Halvanon's liquidator sought $150,000 from Poe to satisfy Poe's purported liability to Halvanon under the 1984 agreement. A brief negotiation ensued during which Poe offered to settle the matter for $5,000, an offer rejected by Halvanon's liquidator, whose offer held firm at $150,000. The parties failed to resolve the matter.

Between 1993 and 1999, Poe heard nothing from Halvanon's liquidator about the 1984 agreement. In early 1999, Poe received letters from Peterson & Ross, Czarina's counsel, seeking payment to Czarina, Halvanon's assignee, under the 1984 agreement. Following an exchange of correspondence, Czarina instituted the London arbitration.

The parties dispute both the extent to which Poe participated in the arbitration and the legal effect of any participation. The record reveals that Poe objected consistently to the arbitration on the dual theories that (1) Poe never received a valid demand for arbitration and (2) no pertinent document contained a valid arbitra-

ment is null and void, inoperative or incapable of being performed.

\* \* \*

Article IV

To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:

  (a) The duly authenticated original award or a duly certified copy thereof;

  (b) The original agreement referred to in article II or a duly certified copy thereof.

2. Although the Federal Arbitration Act provides for the summary disposition of an appli-

cation to confirm an arbitration award, the circumstances of this case, including prominently the temporal remoteness of the governing events, necessitated testimony from expert and fact witnesses, an exercise that materially enhanced and supplemented the record.

3. The designation of a "1984 agreement" is perhaps somewhat misleading to the extent that the designation suggests a contractual arrangement with definite terms. As explained below, some of the terms of the 1984 agreement (including, prominently, a term concerning arbitration) remain energetically disputed. Nonetheless, all parties concede the existence of some contractual relation.

tion agreement requiring Poe to arbitrate. Poe declined to name an arbitrator to the panel.[4]

Poe's participation in the London arbitration consisted of (1) a three-page letter (containing approximately two pages of text) dated March 5, 2001, from Poe's counsel to the arbitration panel and (2) a three-page letter (containing approximately two pages of text) dated May 4, 2001, from Poe's counsel to the arbitration panel. Both letters begin with a conspicuous and unequivocal statement that Poe objects to the arbitration. Following the statements registering Poe's objection, each letter contains a section addressing the validity of Czarina's claim. In contrast to the three arbitration briefs submitted by Czarina, neither of Poe's letters is supported by documentation or affidavits. Although the arbitration briefing schedule allowed both parties to file "written submissions," Poe submitted nothing. On July 10, 2001, the arbitration panel issued an award of £154,442.81, plus interest, attorney's fees, and arbitration fees, in favor of Czarina and against Poe.[5]

### The 1984 Agreement

In 1984, Poe was a member of The Insurance Exchange of the Americas, Inc. (IEA), an incipient reinsurance market located in Miami, Florida, and created in 1983, pursuant to Florida Statutes. The IEA comprised several syndicate members (including Poe). During its operation, the IEA created and employed its own policies, some of which differed from those of other reinsurance markets.[6] The state of Florida liquidated the IEA in 1989.

The formation of an agreement for reinsurance written by the IEA involved the presentation of a risk by an IEA-authorized broker to one or more IEA underwriters. The broker presented the underwriter with a "blue slip," which summarized the risk, the nature of the agreement, the clauses that would be in the "wording" (i.e., the complete contract containing the terms of the reinsurance contract), and other pertinent information. The terms of a blue slip were subject to negotiation, and IEA underwriters regularly made changes to blue slips before signing.[7] If an underwriter wished to participate (following negotiation and

4. The arbitration provision that Czarina invoked permitted each party to appoint one arbitrator of the party's choice, absent which, upon request by the non-appointing party, a substitute arbitrator was to be appointed by the chairman of the British Insurance Association. Because Poe refused to name an arbitrator, a substitute arbitrator was appointed pursuant to this procedure.

5. Czarina asserts that Poe's inclusion in the two letters of argument concerning the validity of the disputed claim constitutes Poe's submission to the jurisdiction of the arbitration panel, participation in the arbitration, and waiver of any objection to the arbitrability of the dispute or validity of the arbitration award. The record reveals that Poe objected consistently to the arbitration. The inclusion of cursory argument addressing the substance of the dispute in two relatively brief letters to the arbitrators fails to demonstrate that Poe

accepted the legitimacy of the arbitration, participated meaningfully in the proceeding, or waived the objections that Poe has asserted consistently, beginning before the arbitration and continuing through the trial. *Compare Al Haddad Bros. Enter., Inc. v. M/S Agapi*, 635 F.Supp. 205, 208–09 (D.Del.1986) (characterizing as "inexcusable" a sixteen-month delay between the staying of an action pending arbitration and a party's objection to validity of a purported arbitration agreement).

6. The IEA apparently operated in accordance with its own policy manual, a copy of which is not part of the record in this action.

7. According to Derek Bennet, an IEA underwriter in 1984 (for an IEA syndicate called Luhas), the "hard market" that existed in the mid–1980's favored underwriters, who often exercised their leverage to modify the terms of a blue slip to favor reinsurers.

changes to the terms, if any), the underwriter would "stamp" and sign the blue slip, write in the underwriter's syndicate's percentage of risk assumed, retain a copy of the blue slip, and return the blue slip to the broker.

Following the preliminary negotiation of the reinsurance agreement by the broker and underwriters, the parties customarily submitted the blue slip to IEA's administrative office, which issued a draft "cover note." The cover note was an abbreviated reinsurance agreement that identified the parties to the agreement and summarized the agreement's material terms. Often, however, the cover note's summary comprised merely a list of headings with little or no elaboration. After preparation of the cover note the broker prepared a draft wording, which was submitted to IEA's administrative office for completion. The IEA maintained a wording department. The IEA wording department prepared the final wording based on the blue slip, the broker's draft wording, and the IEA policy manual, which contained standard clauses for inclusion in every IEA contract.[8]

In late 1983, Poe and three other IEA syndicates entered into a reinsurance agreement with Halvanon (i.e., the 1984 agreement). Halvanon, through its London broker, Hartley Cooper Group, later called Gibbs Hartley (Gibbs Hartley), solicited other insurance companies to agree to reinsure the Halvanon risk. MacDuff Exchange, Inc. (MacDuff), a reinsurance broker for the IEA, solicited IEA members to enter into a reinsurance agreement. Four IEA members, Usher Syndicate, Inc. (Usher); AIB Syndicate, Inc. (AIB); BGH Syndicate, Inc. (BGH); and Poe, agreed to reinsure twenty percent of Halvanon's business. Usher acted as the lead underwriter for the quartet of IEA syndicates that participated in the Halvanon reinsurance agreement.[9] Usher assumed thirty percent of the IEA risk, Poe and AIB each assumed a twenty-five percent share, and BGH assumed twenty percent.

The documentation of this transaction is scarce. A December 22, 1983, "Cover Note No. ME0091" issued by MacDuff to Hartley states that MacDuff obtained reinsurance for Halvanon effective January 1, 1984 (the MacDuff cover note). The MacDuff cover note states that the reinsurance was placed with the IEA but fails to identify Poe or any other IEA syndicate. A February 1, 1984, cover note issued by Gibbs Hartley to Halvanon confirms the placement of reinsurance for forty percent of Halvanon's business, including the twenty percent placed with the IEA syndicates (the Gibbs Hartley cover note). A March 8, 1984, "Confirmation of Cover" issued by the IEA to Halvanon (IEA confirmation of cover) includes an attachment signed by

---

**8.** Described generically, the IEA appears to represent an efficient model for memorializing transactions. On the contrary, the stark absence of pertinent documentation undermines any impression that the IEA efficiently created an adequate documentary history. Indeed, the evidence demonstrates poor or incomplete documentation of IEA transactions. Accordingly, Czarina depends heavily on an understanding of the idiosyncratic laxity of documentation practices in the reinsurance business. *See, e.g., CNA Reinsurance Co. v. Trustmark Ins. Co.*, 2001 WL 648948, at *6 n. 4 (N.D.Ill. June 5, 2001); *Allianz Life Ins. Co. v. Am. Phoenix Life and Reassurance Co.*, 2000 U.S. Dist. LEXIS 7216, at *11–13 (D.Minn. March 28, 2000); *N. Carolina League of Municipalities v. Clarendon Nat'l Ins. Co.*, 733 F.Supp. 1009, 1011 (E.D.N.C. 1990).

**9.** Typically, the lead underwriter negotiated the terms of any particular agreement with the offering broker. Each participating IEA syndicate then accepted the negotiated terms (with the exception of percentage of participation).

the participating reinsurance syndicates (i.e., Usher, AIB, BGH, and Poe).

None of these documents includes any explicit reference to arbitration. The Mac-Duff cover note provides that the wording was "TBA–L/U only," which in reinsurance parlance means that the wording of the agreement was "TBA" (to be agreed), and that only the "L/U" (lead underwriter) would negotiate the wording on behalf of the participating IEA syndicates. Under the heading "Wording," the Gibbs Hartley cover note provides: "To be agreed by Reinsurers." The IEA confirmation of cover states that "wording and terms are subject to agreement between the broker and the underwriter(s)."

In its attempt to recover from Poe, Czarina expended significant efforts and resources to obtain documentation memorializing the terms of the transaction involving the 1984 agreement. However, Czarina fails to produce a wording drafted after the parties entered into the 1984 agreement. The parties appear to agree that no wording was created (or at least that no wording now exists). In all events, the record contains neither a blue slip nor a wording for the 1984 agreement.[10]

In the absence of a wording that sets forth explicitly the terms of the 1984 agreement, Czarina points to a sample 1982 quota share reinsurance agreement (the 1982 sample wording), which contains an arbitration provision the terms of which, according to Czarina, bind Poe. The 1982 sample wording is an unsigned form. Czarina contends neither that Poe executed the 1982 sample wording (Czarina admits that Poe had no relation with Halvanon until 1984) nor that Poe executed an agreement in or after 1984 that contained terms identical to the 1982 sample wording. Instead, Czarina contends that the 1984 agreement (such as it exists as a result of the three documents described above) incorporates implicitly the terms set forth in the 1982 sample wording.

None of the documents memorializing the 1984 agreement incorporates explicitly the terms of the 1982 sample wording. Indeed, none of the documents contains a single reference to the 1982 sample wording. However, Czarina asserts that because standard practice in quota share reinsurance transactions requires all participating reinsurers to accept identical terms of participation, the terms of the 1982 sample wording exemplify the prevailing terms in the market and referentially establish the terms of the 1984 agreement.[11]

The preponderant evidence fails to demonstrate that Poe or Usher, the lead IEA underwriter in the 1984 agreement, agreed to the terms exemplified by the 1982 sample wording.[12] Although the structure of

10. The absence of a wording is not particularly surprising. Testimony at trial concerning the reinsurance business generally establishes that often (during the 1980's) years passed between the placement of reinsurance and the completion of a corresponding wording. In this instance, the 1989 liquidation of the IEA and the subsequent destruction of IEA records in or around 1994 (apparently pursuant to a court order) further lower the probabilities of complete documentation. Nonetheless, Poe concedes the existence of an agreement. Poe merely denies the existence of any contractual obligation to arbitrate.

11. Czarina attempts to bridge the gap between the 1982 sample wording and the 1984

agreement between Halvanon and Poe by presenting a partially executed wording from 1983 (documenting a purported quota share reinsurance transaction between Halvanon and a reinsurer named United India Insurance Company Limited) that appears to match the language in the 1982 wording. Although consistent with Czarina's theory respecting the consistency of terms in quota share transactions, the 1983 document fails to establish that Poe agreed to be bound by the 1982 sample wording.

12. Czarina's position with respect to the structure of quota share reinsurance agreements, although unpersuasive in this instance,

quota share insurance transactions may include the use of uniform wordings over successive years, the record (particularly in light of the testimony of Derek Bennet and James Wurdeman) fails to establish that the IEA syndicates in Miami participating in the 1984 agreement must have or would have accepted the terms contained in the 1982 sample wording. The IEA was a reinsurance market of last resort (that is, a market in which to place, on terms more favorable to the reinsurer, risks that proved unmarketable elsewhere), and IEA syndicates enjoyed sufficient leverage to secure terms more favorable than those available to reinsurers in other reinsurance markets, such as the London markets.[13] The IEA operated according to policies not necessarily consistent with the policies of other reinsurance markets. Some IEA wordings included arbitration provisions; others did not. The standard IEA arbitration provision called for arbitration in Miami rather than London.[14]

All three documents memorializing the 1984 agreement reserve to the underwriter authority to negotiate the wording. Usher, the lead underwriter for the 1984 agreement, typically attempted to negotiate annual contracts individually and avoided continuous contracts that adopted terms other than those negotiated by Ush-

er. In all likelihood, neither Usher nor the other three IEA syndicate participants ever saw the 1982 sample wording or had any way to know the particular terms contained in the 1982 sample wording.

### Conclusions of Law

■■■ Section 203 of Title 9, United States Code, which confers original federal subject matter jurisdiction over an action to confirm an arbitration award under the Convention, provides:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

9 U.S.C. § 203; see also Industrial Risk v. M.A.N. Gutehoffnungshutte, 141 F.3d 1434, 1440 (11th Cir.1998) ("Chapter 2 [of the FAA] generally establishes a strong presumption in favor of arbitration of international commercial disputes [citations omitted] and creates original federal subject-matter jurisdiction over any action arising under the Convention."). However, subject matter jurisdiction vests only when "an action or proceeding" falls under

is not wholly implausible (at least with respect to certain contract terms) given the typical structure of quota share reinsurance transactions. For example, the structure of a quota share reinsurance transaction appears to require that each participating reinsurer accept identical terms with respect to financial and accounting aspects of a given transaction. However, variation among participants' contracts respecting, for example, the method or venue for dispute resolution erects no impediment to the efficiency or efficacy of a quota share arrangement.

**13.** The record suggests that Halvanon experienced difficulty obtaining reinsurance in 1984, perhaps both explaining Halvanon's (or its broker's) reasons for wading into the rela-

tively uncharted waters of the IEA market and buttressing Poe's assertion that IEA underwriters retained and exercised leverage that allowed IEA reinsurance syndicates to negotiate distinctive and more favorable terms.

**14.** Of course, Halvanon, through its broker, sought reinsurance at the IEA, located in Miami; Poe did not venture to London in search of business. Czarina offers no compelling evidence to demonstrate that Poe, a Florida entity transacting business on a Miami reinsurance market, was bound by practices in foreign markets or would have any reason, given a choice, to elect or accept London as the venue for an arbitration.

the Convention, which circumstance requires an "agreement in writing" as defined by Article II(2) of the Convention. *See Kahn Lucas Lancaster, Inc. v. Lark Intern., Ltd.,* 186 F.3d 210, 215 (2nd Cir. 1999) (holding that a federal court lacks subject matter jurisdiction in the absence of an "agreement in writing" as defined by the Convention); *Bothell v. Hitachi Zosen Corp.,* 97 F.Supp.2d 1048, 1053–54 (W.D.Wash.2000) ("Since there is no arbitration agreement under the terms of the Convention, the dispute in question does not fall within the Convention, thus subject matter jurisdiction cannot properly be premised on the Convention."); *Coutinho Caro & Co. U.S.A., Inc. v. Marcus Trading, Inc.,* 2000 WL 435566, at *10 (D.Conn. March 14, 2000) (noting, in the context of a petition to confirm an arbitration award, that furnishing the court with an "agreement in writing" is a "jurisdictional requirement ... for obtaining recognition and enforcement of an arbitral award" under the Convention). Czarina, the party seeking confirmation, bears the burden of proof with respect to the invocation of subject matter jurisdiction. *Lo v. Aetna Int'l, Inc.,* 2000 WL 565465, at *3 (D.Conn. March 29, 2000), *citing McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 182–83, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *In re Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Imp. and Exp. Corp.,* 978 F.Supp. 266, 274 (S.D.Tex. 1997), *citing Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 376–78, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).[15]

■ The Convention defines "agreement in writing" as "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Convention, art. II(2). A majority of courts persuasively conclude that the Convention's definition of "agreement in writing" requires either (1) a signed contract that includes an arbitral clause, (2) a signed arbitration agreement, or (3) an exchange of letters or telegrams demonstrating consent to arbitrate. *See, e.g., Kahn,* 186 F.3d at 218 (holding that "the modifying phrase 'signed by the parties' ... applies to both 'an arbitral clause in a contract' and 'an arbitration agreement.' "); *Bothell,* 97 F.Supp.2d at 1051–52; *Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.,* 109 F.Supp.2d 1236, 1247 (S.D.Cal.2000); *Sen Mar, Inc. v. Tiger Petroleum Corp.,* 774 F.Supp. 879 (S.D.N.Y.1991).[16]

---

**15.** Czarina asserts that the existence of the arbitration award moots, for purposes of jurisdictional, the need for an "agreement in writing" recognized in Article II of the Convention. However, the plain language of Article IV of the Convention, which requires, as a prerequisite to confirmation, presentation of "the original agreement referred to in article II" (i.e., the "agreement in writing") refutes Czarina's position.

**16.** In construing the Convention's definition of "agreement in writing," *Kahn* employs principally the rule of statutory construction explained in *Bingham, Ltd. v. United States,* 724 F.2d 921, 925–26 n. 3 (11th Cir.1984) (i.e., the use of a comma to set off a modifying phrase from other clauses reveals that the qualifying language applies to all of the previ-

ous phrases rather than merely the immediately preceding phrase), supplemented by a careful examination of the Convention's alternate official translations and the Convention's legislative history. In the face of *Kahn's* reasoned consideration and analysis of this issue, *Sphere Drake Insurance PLC v. Marine Towing, Inc.,* 16 F.3d 666 (5th Cir.1994), which concludes that the modifying phrase "signed by the parties" applies only to an arbitration agreement and that an unsigned contract containing an arbitral clause may be enforceable, is unpersuasive. *See also* Susan L. Karmanian, *The Road to the Tribunal and Beyond: Int'l Commercial Arbitration and United States Courts,* Geo. Wash. Int'l L.Rev.17, 68–69 (2002) (commenting on *Kahn's* preferable interpretation of the definition of "agreement in writing").

■ Czarina offers neither a signed contract containing an arbitral clause nor a signed arbitration agreement. The only pertinent document in the record that contains an arbitral clause is the 1982 sample wording, which Poe never signed. The only document signed by Poe is the March 8, 1984, IEA confirmation of cover issued by the IEA to Halvanon, which document includes an attachment signed by the participating reinsurance syndicates (i.e., Usher, AIB, BGH, and Poe). However, the IEA confirmation of cover fails the preliminary requirement of an agreement in writing because the IEA confirmation of cover includes neither an express arbitral clause, a summary arbitration term (e.g., an "arbitration" heading), nor a term incorporating by reference another document that contains an express arbitral clause or summary arbitration term. *See Chloe Z Fishing Co.*, 109 F.Supp.2d at 1249.

■ In the absence of a signed contract containing an arbitral clause or a signed arbitration agreement, Czarina attempts to demonstrate a binding "agreement in writing" created by "an exchange of letter or telegrams." However, as noted above, none of the pertinent documents (i.e., the December 22, 1982, MacDuff cover note; the February 1, 1984, Gibbs Hartley cover note; the March 8, 1984, IEA confirmation of cover) contains a reference to arbitration, a reference to the terms of the 1982 sample wording, or any other indicia of an agreement to arbitrate. *See Bothell*, 97 F.Supp.2d at 1053 (finding no "agreement in writing" in the absence of any "reference, explicit or implied, to arbitration or dispute resolution on the face of these documents.").[17] In short, the proffered documents, viewed either individually or collectively, fail to meet the Convention's jurisdictional requirement of an "agreement in writing."[18]

17. The alternative opportunity to show an "agreement in writing" created by an "exchange of letter or telegrams" erects an only minimal burden. *See, e.g., CNA Reinsurance Co. v. Trustmark Insur. Co.*, 2001 WL 648948, at *1, 6 n. 4 (N.D.Ill. June 4, 2001) (finding a heading on a cover slip stating "Arbitration Clause" sufficient); *Allianz Life Insur. Co. v. American Phoenix Life and Reassurance Co.*, 2000 U.S. Dist. LEXIS 7216, at *13 (D.Minn. March 28, 2000) (same); *North Carolina League of Municipalities v. Clarendon Nat. Ins. Co.*, 733 F.Supp. 1009, 1011 (E.D.N.C. 1990) (acknowledging that the custom and practice to include merely an "Arbitration Clause" heading in the cover note or placement slip is sufficient). However, the evidence fails to satisfy even this minimal requirement.

18. Poe advances an alternative and closely related defense that incorporates much of the reasoning applicable to the jurisdictional issue. Poe asserts that Czarina fails to present a prima facie case pursuant to Article IV of the Convention, which requires a party seeking "recognition and enforcement" of an arbitration award to supply:

(a) The duly authenticated original award or a duly certified copy thereof;

(b) The original agreement referred to in article II or a duly certified copy thereof. Relying on essentially the same argument advanced with respect to the lack of jurisdiction, Poe argues that Czarina's inability to present an "original agreement referred to in article II" (i.e., the "agreement in writing" defined in Article II) fatally impairs Czarina's prima facie case. Curiously, neither a conjunctive nor a disjunctive conjunction explicitly connects subparagraphs (a) and (b) of Article IV. Czarina cites no persuasive authority for the proposition that a party seeking to confirm an award need present only the document required by subparagraph (a) or (b), a proposition that robs subparagraph (b) of any purpose. On the contrary, pertinent authority teaches that the party seeking confirmation must offer both the arbitration award and the arbitration agreement. *See Al Haddad Bros. Enterprises, Inc. v. M/S Agapi*, 635 F.Supp. 205, 209 (D.Del.1986) ("The purpose for requiring submission of the original agreement or a certified copy is to prove the existence of an agreement to arbitrate."); *see also In re Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Imp. and Exp. Corp.*, 978 F.Supp. 266, 309 (S.D.Tex.1997); *Geotech Lizenz AG v. Evergreen Systems*, 697 F.Supp. 1248, 1252 (E.D.N.Y.1988); Gary B. Born,

Of course, a business entity acquires an enforceable obligation to arbitrate consequent upon a properly documented subscription to the written rules of a commercial enterprise, such as a reinsurance market, stock exchange, or the like, that requires arbitration from its participants. Although Czarina has failed by preponderant evidence to establish Poe's acquisition of that obligation in this instance, no insurmountable legal barrier exists to commercially reasonable practices that result in submission to arbitration after participation in a particular market governed by announced regulations that compel arbitration. However, if an entity aspires to enforcement of an arbitration award by resort to the Convention, the ability to offer persuasive evidence of a written obligation to arbitrate is essential, failing which demonstration the mechanisms of the Convention are unavailing.

■ Left without the "agreement in writing" necessary to invoke subject matter jurisdiction (or to establish a prima facie case), Czarina asserts that Poe's "participation" in the London arbitration constitutes a waiver of any objection to confirmation of the arbitration award.[19]

*First Options v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), establishes that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, i.e., a willingness to be effectively bound by the arbitrator's decision on that point. To the contrary, insofar as the [challengers] were forcefully objecting to the arbitrators deciding their dispute with [the opponent], one naturally would think that they did *not* want the arbitrators to have binding authority over them." 514 U.S. at 946, 115 S.Ct. 1920 (emphasis in original). Of course, the record reveals that Poe objected consistently to the arbitration.

Poe's inclusion of limited argument concerning the substance of the dispute in two relatively brief letters to the arbitrators presents a plausible question whether Poe submitted to arbitration, thus waiving its present objections (or at least the objection about Czarina's lack of a prima facie case). However, the record considered in its totality (including, prominently, the testimony of James Wurdeman), fails to establish that Poe accepted the legitimacy of the London arbitration panel, participated meaningfully in the arbitration, or waived objections to the arbitration panel's decision.[20]

International Commercial Arbitration in the United States 504 (1994) ("The party seeking enforcement must provide: (a) the duly authenticated original arbitration award or a duly certified copy thereof; and (b) the original arbitration agreement or a duly certified copy thereof.... If the foregoing materials are properly filed, then a prima facie case has been established under the Convention. The burden of proof then shifts to the party resisting enforcement...."). As discussed above, Czarina fails to submit an arbitration agreement as defined by the Convention, thus leaving Czarina without a prima facie case that invokes the subject matter jurisdiction of the district court to confirm the award.

19. With respect to a "waiver" of subject matter jurisdiction, Czarina's argument apparently assumes (without citation to authority) that a party's "waiver" of an objection based on a

lack of subject matter jurisdiction forecloses an inquiry into the existence of subject matter jurisdiction, a position seemingly at odds with traditional notions of the mandatory limiting role played by subject matter jurisdiction in federal courts. *See, e.g.,* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action.").

20. *Slaney v. International Amateur Athletic Federation,* 244 F.3d 580 (7th Cir.2001), a case which Czarina repeatedly cites, is instructive. *Slaney* enforces an arbitration award principally on a finding that the party challenging the arbitration award participated without objection in the underlying arbitration proceeding. 244 F.3d at 591 ("An examination of Slaney's actions following the IAAF's submission of the matter to the Tribu-

Accordingly, for the reasons stated above, Czarina's application for an order confirming the arbitration award (Doc. 1) is **DENIED.** All remaining pending motions are **DENIED.** This matter is concluded, and the Clerk is directed to **CLOSE THE FILE.**

nal leads to only one conclusion: Slaney was a participant in the arbitration. During the arbitration, Slaney's counsel appeared before and presented arguments to the Tribunal. Her counsel called an expert witness to testify on Slaney's behalf, filed a motion to dismiss, and a motion for summary judgment. Furthermore, Slaney's counsel moved for an interlocutory ruling regarding the burden of proof the Tribunal would apply. Given this level of participation, the district court was correct to reject Slaney's contention that she was merely an interested athlete in the proceedings.... Here, an arbitration has already taken place in which, as we have determined, Slaney freely participated."). In contrast, Poe engaged in a notably more limited and obviously dissimilar course of action from the campaign of calculated engagement described in *Slaney.* Under the circumstances of this case, Poe's limited argument before the arbitrators effects no waiver.